[909 NYS2d 463]

The People of the State of New York, Respondent, v Delroy Colville, Appellant.

Second Department, October 5, 2010

## APPEARANCES OF COUNSEL

*Delroy Colville*, pro se, and *Lynn W. L. Fahey*, New York City (*Reyna E. Marder* of counsel), for appellant.

*Charles J. Hynes, District Attorney*, Brooklyn (*Leonard Joblove* and *Anthea H. Bruffee* of counsel), for respondent.

## OPINION OF THE COURT

CHAMBERS, J.

On this appeal, we primarily address whether the defendant, who was charged with murder in the second degree, was deprived of the effective assistance of counsel when trial counsel, after consulting with the defendant, acceded to the defendant's wish that he withdraw his request to the Trial Judge to include the lesser offenses of manslaughter in the first degree and manslaughter in the second degree in the charge to the jury. We conclude that the defendant was afforded the effective assistance of counsel.

I. Factual Background

The defendant stabbed and killed the 20-year-old victim, Gregory Gardner, on the third floor of a single room occupancy dwelling during an altercation.

At the time of the incident, the defendant was renting one bedroom, while Carl J. (hereinafter Carl), Carl's 11-year-old son, Jazeel, and Abnor George occupied the other three bedrooms on the third floor, and the four occupants shared a kitchen.

Carl, Jazeel, and George, while observing different portions of the incident, collectively testified that Gardner, a tenant from a neighboring building, after visiting a friend one floor below, had come up to the third floor and sat in the common kitchen with Carl, Carl's girlfriend Jacqueline, and Jazeel. Some time later, the defendant arrived home, entered his bedroom, and slammed the door to his bedroom. When the defendant emerged from his room and went into the kitchen, Gardner asked him why he was slamming the door. The defendant responded that Gardner did not live there and should "[m]ind [his] business," and then "came [close to Gardner's] face." The defendant struck Gardner, and they started fighting. As they fought and struggled, the defendant fell to the floor. Gardner grabbed an ashtray from the kitchen counter and, holding the defendant in a headlock, struck him in the head with the ashtray, possibly two or three times, leaving him bloodied. George intervened by grabbing the ashtray, and he said, "if you're going to fight, fight like men, [with] no weapon in your hand[s], [and] when you're tired, you stop." The defendant and Gardner struggled further before George separated them, and they were told the fight was over. Gardner grabbed his sweater and, heading to the hallway leading to the stairs, said the fight was finished. The defendant, meanwhile, ran to his room, retrieved his butcher knife, and ran at Gardner. Gardner, although warned by Carl, slipped on a rug, and the defendant stabbed him. Gardner fell to the hallway floor, and the defendant got on top of him and continued to stab him. Jacqueline tried to stop the defendant by getting between him and Gardner, and she shouted for the defendant to stop, that he was going to kill Gardner. The defendant pushed her away, telling her to move and that he had to kill Gardner. In doing so, he cut Jacqueline on the hand. She shouted for Carl to help, and Carl went behind the defendant, but the defendant spun around and sliced Carl's lip. After he cut Carl, the defendant said to Gardner, "go outside and die now. You're not going

to beat me up and tell your friend that you beat me up." Gardner walked down the stairs before collapsing outside in front of a tree.

The police arrived on the scene and followed a trail of blood from Gardner to the front steps, the lobby, and up the interior stairs to the third floor. On the third floor, there was blood in the hallway and on the floors, walls, and banisters, but there was no blood in the kitchen. An ashtray, described as heavy, but appearing to lack any blood on it, was found on the kitchen table. The door to the defendant's bedroom was locked, and the officers kicked it down. The defendant, with blood on his head and face, was removed from inside a closet and handcuffed. He blurted out that Carl and Gardner had started an argument with him, that Gardner had grabbed him by the shirt and struck him in the head with an ashtray, and that Gardner "shouldn't have messed with him," a statement which he repeated several times. The defendant said he picked up the knife and defended himself. He led the officers to the vestibule downstairs, where he had placed the knife inside a mailbox.

The defendant was transported to the 67th Precinct where, after being given his *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]), he gave both oral and written statements. He stated that approximately two months earlier, Carl had stolen his printer. On the day of the incident, the defendant saw Carl and Gardner, whose name he did not know as he had only seen him a couple of times, sitting in the shared kitchen. The defendant did not speak to Gardner, but went into his bedroom and slammed the door shut. Gardner started yelling at the defendant through the door. The defendant came out, and Gardner aggressively asked him why he was slamming the door. He responded, "[D]on't talk to me. I don't know you." Gardner stood up out of his chair and got in the defendant's face, telling the defendant that he (Gardner) was "carrying [a] grievance" because the defendant had accused him of stealing his printer. The defendant asked Jacqueline to tell Gardner to leave because he did not live in the building. Gardner became more aggressive, grabbing the defendant's clothes and then hitting him over the head, face, and body with a glass ashtray. A struggle ensued during which the defendant picked up a kitchen knife and, while trying to defend himself, stabbed Gardner and cut Carl on his mouth. The defendant claimed it was "all in self-defense," that "a man came into my kitchen beating me up and I defended

myself." After he completed his statement, the defendant was taken to the hospital, where he received seven stitches.

An autopsy of Gardner's body revealed that he had sustained six incised wounds and three stab wounds. Three incised wounds ran along the left side of Gardner's trunk, while the other three were along his left arm, wrist, and hand. Two of the stab wounds were on Gardner's left hand, one to the palm, and the other to the back of the hand. The third and likely fatal stab wound was to Gardner's upper left abdominal quadrant. The wound was eight inches deep, running from the front of the body to the back, and left to right, in a downward direction. It penetrated the cartilaginous tissue of the seventh rib inside the chest cavity, to the left diaphragm, the stomach, the duodenum, and stopped at the left kidney, which was removed during surgery. The cut through cartilaginous tissue indicated that "some force" had been used.

The defendant testified on his own behalf. He told the court and jury that he earned his living as a photographer, using a digital printer to make prints that he would then sell. About two months prior to the incident, the defendant was gathering his equipment for a job he had later that evening. He placed some of his equipment out in front of a tree and told Carl, who was outside on the front steps with Gardner and several other people, to keep an eye on it. The defendant went upstairs to his bedroom, retrieved some other equipment, including his photo printer, and placed the printer in the vestibule, again telling Carl to watch it for him. The defendant flagged a taxi cab and placed his things inside but, after going around the block, realized he had left his printer behind. He returned to his building, but the printer was no longer in the vestibule. He accused those sitting in front of the building, who had said he did not leave his printer there, of "conspiring to steal [his] printer," and he cursed at Carl. He told them he would contact the police, and he subsequently made an oral report to the police.

On the day of the incident, the defendant emerged from his bedroom at around 4:00 P.M. to find Carl and Gardner sitting in the kitchen. He thought "something was fishy" because he had never before seen Gardner in the kitchen. The defendant returned to his room, slamming the door behind him. Fifteen minutes later, the defendant went back to the kitchen, and Gardner, alone now, asked why the defendant was slamming the door. The defendant replied, "that is not your business, man. Mind your own business. I don't know you. Don't talk to me."

Gardner rose out of his chair, and got in the defendant's face, telling the defendant that he was "carrying a grievance" because the defendant had accused him of stealing his printer. Speaking to Jacqueline, the defendant said for her to tell Gardner "to go where he [was] going," and turned his back to him. Gardner grabbed the defendant by the shirt collar and started to beat him in, among other places, his head and face. "[D]own and almost blacked out," the defendant thought Gardner was going to kill him. He tried to find something and, reaching onto the kitchen counter where his dish drainer was located, he came up with a knife. As he struggled with Gardner, the defendant defended himself. Carl came into the kitchen and tried to hold the defendant from behind while reaching for the knife, but the defendant "flashed" him off. He did not recall George taking the ashtray away from Gardner or breaking up the altercation. The defendant and Gardner continued to struggle, tumbling all over the place which, the defendant explained, was why there was no blood in the kitchen. The defendant still held the knife, and then he saw blood coming from Gardner, causing him to back off and Gardner to run down the stairs. It was "[m]ost likely during all that aggression," the defendant said, that Gardner was stabbed. However, he did not intend to kill Gardner and, in fact, he did not intend to stab either Gardner or Carl.

At the conclusion of the evidence, the court held a charge conference. Defense counsel indicated that he had advised the defendant that manslaughter in the first and second degrees should be charged to the jury as lesser-included offenses of murder in the second degree. Defense counsel explained to the defendant that although manslaughter still carried significant prison time, charging murder alone left the jury with "no leeway, no choice." Thus, counsel was requesting that manslaughter in the first and second degrees be charged to the jury. The court denied the request, but stated it would allow counsel to address the issue again when the trial reconvened.

At that time, defense counsel informed the court that after discussing the issue with the defendant again, he had been advised that the defendant did not want the lesser-included offenses charged to the jury. The following exchange then occurred:

> "DEFENSE COUNSEL: It is my understanding, that this represents, if I understand correctly, a change of position . . . [A]s the attorney here, I am only . . . as the Supreme Court has said, the guiding hand. It is my opinion as a matter of strategy, and

as a matter of sound practice, it is my opinion that lesser-includeds should be submitted. It gives—in my opinion, and based upon my experience only—it gives the jury an out.

"THE COURT: I am going to stop you, Mr. Katowitz. The reason that you include lesser-included offenses is not to give the jury an out . . . So the record is clear, the reason they are included is because there is a reasonable view of the evidence to suggest that a finder of fact may think that that was what happened, as opposed to the top count.

"DEFENSE COUNSEL: Correct. I phrased it [in]artfully . . . I am trying to protect Mr. Colville here, and the Court has phrased it more artfully than I could have, and perhaps as I should have, if there are reasonable views of the evidence. I don't know where to go from here except I am always guided by the Court.

"THE COURT: So I understand, are you withdrawing your request, and now suggesting that I only charge murder 2, and assault 2? Is that what you want? I am going to ask you again, is it your request at this point that I not charge man 1, and man 2?

"DEFENSE COUNSEL: I am checking with the defendant.

"THE COURT: If that is where we are going, instead of using you, why don't I ask Mr. Colville. Mr. Colville, Mr. Katowitz just said to me that after talking to you, you said to him that you don't want me to charge this jury with manslaughter in the first degree, and manslaughter in the second degree. You want me to take them off of the verdict sheet and not have this jury consider them, if they were to even get there. Is that what you want me to do?

"THE DEFENDANT: If the jury feels that I intentionally caused the death of Mr. Gardner, there is nothing I can do about it. I am prepared. The first time in my life I've been in a situation like this, I've been incarcerated, so I am saying that I am charged with two charges; whatever decision they make, there is nothing I can do about it.

"THE COURT: You don't want to give them the other charges?

"THE DEFENDANT: No.

"DEFENSE COUNSEL: Judge, let me confer with him.

"THE COURT: I will give you five minutes. We are ready to go. We have a jury in the back waiting. We have gone through this three times.

"DEFENSE COUNSEL: I understand, but I view this as so critical.

"THE COURT: . . . I will have Mr. Katowitz discuss with Mr. Colville whether or not he wants to include those lesser-included offenses. If he does, we will come back in five minutes.

"DEFENSE COUNSEL: Judge, for the record, I have the applicable sections of the Penal Law with me. I am going to find them . . . murder and manslaughter.

"THE COURT: You have the charge in front of you. I gave it to you. The elements are right there. Go in the back with the charge I gave you, and read it to him."

After a brief recess, the court made clear for the record that it had, at the request of defense counsel and with the People's acquiescence, earlier agreed to charge manslaughter in the first and second degrees. However, the court indicated that the defendant no longer wanted those lesser offenses included. The court then verified that this was the defendant's decision three separate times. Defense counsel reiterated that this was against his advice, that he had explained to the defendant that the punishment for murder far exceeded that of manslaughter. Defense counsel showed the defendant the verdict sheet containing only murder in the second degree and assault in the second degree, the latter pertaining to Carl, stating he wanted to make sure he discharged his ethical obligation to the defendant. The court reassured counsel that no more could be done, that everything had been explained to the defendant, the record was clear, and the verdict sheet contained what the defendant wanted included. The court asked if there was any objection to the verdict sheet, and counsel responded that his request as to the counts charged was consistent with the defendant's request.

However, counsel did object to the court's failure to include a no duty to retreat instruction. Counsel argued that based on a

reasonable view of the evidence, the defendant was in his dwelling at the time of the altercation and, thus, had no duty to retreat. The court denied the requested instruction, stating that there was nothing to suggest that the common areas, such as the hallway or kitchen, were dwelling areas. Counsel, after taking exception to the court's ruling, further argued that when a person paid rent in a single room occupancy dwelling, such included the common areas, and the shared kitchen here was part of the dwelling. The court's charge did not include the no duty to retreat instruction.

The jury returned a verdict acquitting the defendant of assault in the second degree, but convicting him of murder in the second degree.

## II. Ineffective Assistance

A defendant has a constitutional right to effective assistance of counsel, which, under the New York standard, requires that he be afforded "meaningful representation" (*People v Baldi*, 54 NY2d 137, 147 [1981]; *People v Caban*, 5 NY3d 143, 155-156 [2005]). The standard is a flexible one, which views in totality and at the time of the representation, the evidence, the law, and the circumstances of the particular case in determining whether counsel provided meaningful representation (*see People v Henry*, 95 NY2d 563, 565 [2000]; *People v Hobot*, 84 NY2d 1021, 1022 [1995]). However, a single, substantial error by counsel which so seriously compromises a defendant's right to a fair trial will qualify as ineffective representation (*see People v Hobot*, 84 NY2d at 1022). In determining whether the defendant was afforded meaningful representation, prejudice must be considered, a component which focuses on the fairness of the process as a whole rather than any particular impact on the outcome of the case (*see People v Henry*, 95 NY2d at 566; *People v Benevento*, 91 NY2d 708, 714 [1998]; *People v Hobot*, 84 NY2d at 1024). "In reviewing claims of ineffective assistance care must be taken to avoid both confusing true ineffectiveness [of counsel] with mere losing tactics and according undue significance to retrospective analysis" (*People v Satterfield*, 66 NY2d 796, 798 [1985] [internal quotation marks omitted]). Thus, it is the defendant who bears the burden of overcoming the strong presumption that defense counsel rendered effective assistance by demonstrating the absence of strategic or other legitimate explanations for counsel's alleged errors (*see People v Benevento*, 91 NY2d at 712; *People v Baldi*, 54 NY2d at 147; *People v Walker*, 35 AD3d 512 [2006]).

In contrast, the federal standard governing an ineffective assistance of counsel claim requires that a defendant show that counsel's performance fell below an objective standard of reasonableness and but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different (*see Strickland v Washington*, 466 US 668, 687, 694 [1984]).

Having accepted the assistance of counsel, a defendant retains authority over certain fundamental decisions (*see Jones v Barnes*, 463 US 745, 751 [1983]; *People v Colon*, 90 NY2d 824, 825 [1997]; *People v White*, 73 NY2d 468, 478 [1989], *cert denied* 493 US 859 [1989]). Strategic and tactical decisions, in contrast, rest with counsel (*see People v Colon*, 90 NY2d at 826; *Arko v People,* 183 P3d 555, 558 [Colo 2008]). The demarcation between the two, however, is elusive (*see Government of Virgin Is. v Weatherwax,* 77 F3d 1425, 1433 [1996], *cert denied* 519 US 1020 [1996]).

Those decisions that have traditionally been considered fundamental include whether to accept a plea of guilty, waive a jury trial, testify in one's own behalf, or take an appeal (*see Jones v Barnes*, 463 US at 751; *People v Colon*, 90 NY2d at 825-826; *People v White*, 73 NY2d at 478). Such decisions are so personal and crucial to the defendant's fate that the defendant must make the decisions for himself (*see Government of Virgin Is. v Weatherwax,* 77 F3d at 1435; ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2, Commentary [3d ed 1993]). Strategic and tactical decisions entrusted to counsel include which jurors to accept or strike, which witnesses should be called on the defendant's behalf, what evidence should be introduced, whether to object to the admission of evidence, whether and how a witness should be cross-examined, and whether to consent to a mistrial (*see People v Colon*, 90 NY2d at 826; *People v Ferguson,* 67 NY2d 383, 390 [1986]; *People v Parker,* 290 AD2d 650, 651 [2002]; ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2 [b] [3d ed 1993]). Such decisions belong to counsel because they often involve legal complexities and have to be made in circumstances that do not allow for extended, if any, consultation (*see State v Eckert,* 203 Wis 2d 497, 509-510, 553 NW2d 539, 544-545 [1996]; *Van Alstine v State,* 263 Ga 1, 3, 426 SE2d 360, 362-363 [1993]; ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2, Commentary [3d ed 1993]).

As to whether the decision to have lesser-included offenses charged to the jury is a fundamental or strategic one, other

jurisdictions that have confronted the issue have reached conflicting conclusions. The conflict apparently stems from the American Bar Association's change in position on this matter.

The American Bar Association (hereinafter ABA) Standards are prevailing norms of practice that act as a guide in determining what is reasonably competent representation (*see Padilla v Kentucky*, 559 US —, —, 130 S Ct 1473, 1482 [2010]; *Strickland v Washington*, 466 US at 688-689). In its second edition, for the standards governing the defense function, specifically, the control and direction of the case between counsel and client, the authors commented that the decision as to whether to submit lesser-included offenses to the jury should fall to the defendant.[1] The authors reasoned that this decision was "so important" that it was on par with the decision about the charges to which to plead (*see* ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2, Commentary [2d ed 1980]). Several courts, relying on the ABA Standards and its rationale, reached the same conclusion (*see People v Brocksmith*, 162 Ill 2d 224, 229, 642 NE2d 1230, 1232-1233 [1994] [the court compared the decision to submit an instruction on a lesser charge to the decision of what plea to enter and stated that both decisions should ultimately be made by the defendant because they directly related to the loss of liberty]; *State v Boeglin,* 105 NM 247, 252, 731 P2d 943, 948-949 [1987] [holding that the defendant, not defense counsel, must ultimately decide whether to seek submission of lesser-included offenses to the jury]; *In re Trombly,* 160 Vt 215, 219, 627 A2d 855, 857-858 [1993] [noting that the ABA Standards were directly applicable to the case before it]; *see also Simeon v State,* 90 P3d 181, 184 [Alaska 2004] [noting conflicting authorities]; *but see Van Alstine v State,* 263 Ga 1, 3-4, 426 SE2d 360, 362-364 [1993] [declining to follow ABA Standards on whether the decision to seek submission of lesser-included charges should be for the defendant; the court reasoned that this decision did not rise to the level of whether to plead guilty, and it involved legal complexities only the most sophisticated client could comprehend, not unlike tactical decisions involving the assertion of technical defenses]).

However, in its third edition, promulgated in 1993, the ABA eliminated its reference in the Commentary that the decision to

---

1. The Commentary to the ABA Standards is considered "unofficial"— only a useful explanation of the text of the ABA's black letter standards.

seek the submission of lesser-included offenses should be for the defendant. Instead, in commenting on the allocation of decision-making in matters of trial strategy and tactics, the ABA authors wrote, "[it] is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury" (ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2, Commentary, at 202 [3d ed 1993]). Thus, thereafter, a number of courts concluded that the decision to seek a jury charge on lesser-included offenses was a strategic one, relegated to counsel (*see Arko v People,* 183 P3d at 557-560 [Colorado court noting that the ABA's third edition overruled the previous edition, which had allocated the decision to request lesser offense instructions to the defendant; thus, under the current ABA Standards, such a decision was a tactical one, reserved to defense counsel after consultation with his client]; *Simeon v State,* 90 P3d at 184 [Alaska court noting the change in the ABA's position and concluding that the lawyer has the ultimate authority to make other decisions governing trial tactics including whether to request lesser-included offenses]; *Mathre v State,* 619 NW2d 627, 2000 ND 201 [2000] [noting the ABA omitted the language in its third edition that it should be the defendant who decides whether to seek submission of lesser-included offenses to the jury, and concluding that such a decision is a tactical one]; *State v Edwards,* 119 Ohio App 3d 106, 109-112, 694 NE2d 534, 536-537 [1997] [holding that the decision to seek submission of lesser-included offenses is a nonfundamental one reserved to counsel's judgment; as such, that decision could be made by trial counsel without express authority of the defendant]).

The Court of Appeals has not squarely addressed this particular issue. However, in *People v Petrovich* (87 NY2d 961 [1996]), the Court was presented with a related question: as between the defendant and his counsel, who decides whether the affirmative defense of extreme emotional distress should be submitted to the jury? There, the defendant was accused of murdering his parents, and his defense at trial was that he was suffering from a mental disease or defect at the time. At the conclusion of the evidence, counsel initially indicated that he was requesting an instruction on extreme emotional disturbance. However, the next day, at the insistence of the defendant, and despite his advice to the contrary, counsel withdrew the request. The trial court gave the defendant and counsel additional time to discuss

the matter. The defendant, however, remained fixed in his position, and the trial court concluded that the defendant's decision was determinative. The Court, on appeal, held that this decision did not implicate a matter of trial strategy or tactics; rather, it was a fundamental decision and, thus, it fell to the defendant. The Court reasoned, citing to the second edition of the ABA Standards, that a verdict was dispositive of a defendant's fate and the submission of the extreme emotional disturbance defense could be determinative of the verdict. In that sense, as the defendant expressed on the record, eliminating the extreme emotional disturbance defense increased his chances of a full acquittal. Thus, the Court concluded, this was not unlike other fundamental decisions already recognized as belonging to the defendant.

More recently, the Appellate Division, Fourth Department, relying on *Petrovich,* concluded that a defendant was not deprived of his right to make a fundamental decision when the court considered a lesser-included offense charge after discussing the issue with defense counsel and the prosecutor, without input from the defendant (*see People v Taylor*, 2 AD3d 1306, 1308 [2003]).

In this instance, we need not determine whether the decision to seek the submission of lesser-included offenses to the jury is a fundamental or strategic decision. It suffices to say that whether fundamental or strategic, the defendant was not deprived of the effective assistance of counsel. If fundamental, then the defendant made the ultimate decision (*see People v Petrovich*, 87 NY2d at 963). If strategic, counsel's representation was not objectively unreasonable or less than meaningful merely because, after fully consulting with the defendant, he did not overrule the defendant's decision that lesser-included offenses should not be submitted to the jury (*see Strickland v Washington*, 466 US at 691 ["The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant"]; *People v Caban*, 5 NY3d at 152 ["to establish ineffective assistance, a defendant must demonstrate the absence of strategic *or other legitimate explanations* for counsel's allegedly deficient conduct" (emphasis added; internal quotation marks omitted)]; *People v Sprosta*, 49 AD3d 784, 785 [2008] [holding that record revealed strategic or legitimate explanations for the

alleged instances of ineffective assistance]). Counsel, faced with a disagreement with the defendant on a matter ostensibly strategic in nature, acted in accordance with the ABA Standards.[2] Counsel made a record of the circumstances, his advice and reasons, and the conclusion reached (*see* ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2 [c] [3d ed 1993]). The ABA Standards implicitly recognize that the conclusion reached will not always comport with the advice of counsel, but counsel's acquiescence to his client's decision does not render counsel's representation constitutionally ineffective (*see Coleman v Mitchell,* 244 F3d 533, 545 [2001], *cert denied* 534 US 977 [2001]; *Ex parte Mills,* — So 3d —, 2010 WL 3463487, 2010 Ala LEXIS 157 [Ala 2010] [stating that a reading of the ABA Standards does not support the conclusion that the defendant may never make the ultimate decision regarding a matter of trial strategy such as whether to submit a lesser-included offense instruction to the jury]; *People v Gadson,* 19 Cal App 4th 1700, 24 Cal Rptr 2d 219 [1993] [holding that counsel's representation was not deficient because, despite his advice to the contrary, he followed the defendant's instruction to call two witnesses on his behalf]; *People v Galan,* 213 Cal App 3d 864, 866-869, 261 Cal Rptr 834, 835-836 [1989] [rejecting contention that counsel was ineffective because he called a witness at the defendant's insistence after explaining the risks and advising against it]; *see also People v Henriquez,* 3 NY3d 210, 211 [2004] [holding that the defendant was not denied his right to counsel when he refused to allow his attorney to participate in the trial]).

Had there been no disagreement, counsel's decision to seek the submission of lesser-included offenses, or not, could be justified as a strategic decision of a reasonably competent attorney

---

2. One empirical study has shown that a significant percentage of public defenders surveyed are of the opinion that if there is a disagreement between client and counsel on whether lesser-included offenses should be submitted, the client's decision should control. The divergent opinions on this issue may be attributed to how the attorney views the relationship, whether lawyer-centered or client-centered (*see* Uphoff and Wood, *The Allocation of Decision-making Between Defense Counsel and Criminal Defendant: An Empirical Study of Attorney-Client Decisionmaking,* 47 U Kan L Rev 1, 7-8, 45-46 [1998]; *see also Jones v Barnes,* 463 US at 751 [adhering to traditional lawyer-centered approach]; *compare with Jones v Barnes,* 463 US at 754 [Blackmun, J., concurring] [espousing client-centered approach]; *Simeon v People,* 90 P3d at 183 [in Alaska court, counsel stated that it was her practice to give considerable deference to the client's wishes when deciding whether or not to request lesser-included offense instructions]).

(*see People v Lane*, 60 NY2d 748, 750 [1983]; *People v Calderon*, 66 AD3d 314, 320 [2009]; *People v Illescas*, 47 AD3d 840, 841 [2008]; *People v Koufomichalis*, 2 AD3d 987, 989 [2003]; *People v Drummond*, 188 AD2d 312 [1992]; *People v Vargas*, 150 AD2d 513, 514 [1989]). Each scenario, to submit lesser-included offenses or not, requires a balancing of risk versus reward, which necessarily entails an evaluation of the evidence, the law, and the members sitting on the jury (*see People v Baker*, 14 NY3d 266 [2010] [stating that the defendant's attorney may have thought there was a benefit to giving the jury the option of considering manslaughter in the second degree at the same time it deliberated over the depraved indifference murder and first-degree manslaughter charges; namely, if jurors were split on either of the higher counts, defense counsel may have reasoned that they would compromise by convicting the defendant of the less serious offense]; *Mathre v State*, 619 NW2d at 630, 2000 ND at ¶ 8 [trial attorney, giving his reasoning for not seeking lesser-included charge, stated that doing so, in his opinion, substantially reduced the risk of conviction on the serious charge "to a little less serious, but it virtually guarantee(d) a conviction for something"]; *People v Brocksmith*, 162 Ill 2d at 232-233, 642 NE2d at 1234-1235 [Freeman, J., concurring] [noting that the decision to tender a lesser-included offense instruction involves a calculated risk based on counsel's assessment of the evidence and the perceived likelihood the jury will convict rather than acquit altogether]; *In re Trombly*, 160 Vt at 217, 627 A2d at 855-856 [trial counsel objected to inclusion of manslaughter instruction, stating his client's preference that if the State failed to prove intent, the jury would not have the option to compromise its verdict]). Trial counsel made clear on the record that he had explained the amount of punishment the defendant was facing on a conviction for manslaughter as opposed to murder, the former being significantly less than the latter, and that in his experience the submission of manslaughter to the jury would give them some "leeway," that is, the opportunity to reach a compromise verdict. The defendant thought the evidence showed that he had not intended to kill Gardner and, if the jury found otherwise, the defendant was resigned to accept their conclusion. After fully consulting with his attorney, the defendant decided to disregard counsel's advice and pursue an all-or-nothing strategy, and counsel acceded to that decision. It is not for this Court to pass upon the wisdom of the defendant's decision, for, as has often been stated in the context of an inef-

fective assistance of counsel claim, a reviewing court may not, aided by the wisdom of hindsight, second-guess matters of trial strategy (*see People v Satterfield*, 66 NY2d at 799-800; *People v Finley*, 27 AD3d 763 [2006]; *People v Baston*, 181 AD2d 786, 787 [1992]). Accordingly, counsel's conduct in acquiescing to the defendant's decision not to request submission of lesser-included offenses to the jury did not rise to the level of constitutionally ineffective assistance.

### III. No Duty to Retreat Charge

A trial court is required to charge the jury on the defense of justification whenever, viewing the record in the light most favorable to the defendant, there is any reasonable view of the evidence that the defendant reasonably believed deadly physical force was necessary to defend against the imminent use of deadly physical force (*see* Penal Law § 35.15 [2] [a]; *People v Jones*, 3 NY3d 491, 494 [2004]; *People v Fermin*, 36 AD3d 934, 935 [2007]; *People v Black*, 33 AD3d 338, 340-341 [2006]). Even then, a defendant may not use deadly physical force "if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating" (Penal Law § 35.15 [2] [a]; *see People v Jones*, 3 NY3d at 494). Thus, if evidence on the record rationally supports a finding that the defendant could have safely retreated, the People are entitled to an instruction regarding the duty to retreat (*see People v Cummings*, 303 AD2d 520, 521 [2003]; *People v Barcena*, 131 AD2d 688, 688-689 [1987]). However, the duty to retreat does not apply where the defendant is in his or her dwelling and is not the initial aggressor (*see* Penal Law § 35.15 [2] [a] [i]; *People v Jones*, 3 NY3d at 495; *People v Fermin*, 36 AD3d at 935; *People v Carrera*, 282 AD2d 614, 616 [2001]). Where there are issues of fact as to whether the area where the struggle occurred was part of the defendant's dwelling, the court should charge the jury that the defendant "would not be required to retreat if the defendant was in his dwelling and was not the initial aggressor" (*see People v Daniel*, 35 AD3d 877, 878 [2006]; *People v Carrera*, 282 AD2d 614, 616 [2001]; CJI2d[NY] Penal Law § 35.15).

Penal Law § 35.15 does not define "dwelling" (*see People v Hernandez*, 98 NY2d 175, 180 [2002]). However, the Court of Appeals has interpreted "dwelling" to refer to a person's residence, which must therefore account for a myriad of living arrangements, from rural farm properties to large apartment buildings (*id.* at 182).

"[T]he determination of whether a particular location is part of a defendant's dwelling depends on the extent to which defendant (and persons actually sharing living quarters with defendant) exercises exclusive possession and control over the area in question. The term encompasses a house, an apartment or a part of a structure where defendant lives and where others are ordinarily excluded—the antithesis of which is routine access to or use of an area by strangers" (*id.* at 182-183).

■ Here, assuming that the shared kitchen constituted a part of the defendant's dwelling and that, based on the defendant's testimony, there was a reasonable view of the evidence that he was first confronted with deadly physical force while in his dwelling (*see* Penal Law § 35.15 [2] [a]; *Matter of Y.K.*, 87 NY2d 430, 434 [1996]), thereby entitling him to a jury instruction that he would not be required to retreat if he was in his dwelling and was not the initial aggressor, any error was harmless (*see People v Crimmins*, 36 NY2d 230, 242 [1975]). Given the markedly consistent testimony of the three witnesses that, prior to the fatal stabbing, the altercation had ended, the number and severity of knife wounds Gardner suffered, and the lack of blood in the kitchen, the evidence disproving the defense of justification was overwhelming. Moreover, there is no significant probability, or even a reasonable possibility, that the verdict would have been different had the "no duty to retreat" instruction been given. Accordingly, any error in the court's charge was harmless (*see People v Petty*, 7 NY3d 277, 286 [2006]; *People v Jones*, 3 NY3d 491, 497 [2004]; *People v Crimmins*, 36 NY2d 230, 243 [1975]; *Matter of Gabrielle M.*, 33 AD3d 1005 [2006]; *People v Connelly*, 32 AD3d 863, 864 [2006]; *People v Aiken*, 6 AD3d 236, 237 [2004], *affd on other grounds* 4 NY3d 324 [2005]; *see also People v Palmer*, 34 AD3d 701, 703-704 [2006]).

## IV. Remaining Contentions

In fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]; *People v Wimberly*, 19 AD3d 518, 519 [2005]).

The defendant's remaining contentions, raised in his supplemental pro se brief, are unpreserved for appellate review and, in any event, are without merit. Therefore, the judgment is affirmed.

FISHER, J.P., SANTUCCI and ENG, JJ., concur.

Ordered that the judgment is affirmed.