OPINION OF THE COURT
 

 Graffeo, J.
 

 Defendant was convicted of manslaughter and criminal use of a firearm after he shot and killed James Carter inside the Bronx apartment building where defendant resided. At trial, defendant pursued a Penal Law § 35.15 (2) justification defense, asserting that the victim, a guest of another tenant, had attacked him in the lobby and a struggle ensued on a common stairwell which culminated in the shooting. On appeal, defendant contends Supreme Court erred when it refused to instruct the jury that defendant had no duty to retreat from the lobby and stairwell because these areas were part of his dwelling under Penal Law § 35.15 (2) (a) (i). We disagree.
 

 Defendant was charged with two counts of murder in the second degree (intentional and depraved indifference), and single counts of manslaughter in the first degree, criminal use of a firearm in the first degree and criminal possession of a weapon in the second degree, all arising out of the shooting of James Carter. Defendant not only resided in a first-floor apartment in the building but also was employed as the on-site building superintendent.
 

 
 *178
 
 The People’s primary witnesses at trial were three other tenants: Milagros and Sari Santiago, two sisters who lived together in a second-floor apartment, and Mary S., another resident. Sari’s boyfriend, James Carter, was a frequent visitor to the building. The morning of the shooting, Milagros Santiago and James Carter went to defendant’s apartment and requested that repairs be undertaken in the Santiagos’ apartment. Mary S. testified that she was present in the lobby and heard defendant respond by swearing and referring to Carter, who was African-American, in racially derogatory terms. Defendant and his brother (a building handyman) then accompanied Milagros and Mary S. upstairs to survey the damage while Carter stepped outside the building. After defendant loudly berated her for bringing Carter to his apartment to lodge a complaint, Milagros departed to find Carter.
 

 Defendant, his brother and Mary S. soon left the Santiago apartment and began walking downstairs, meeting Carter and Milagros on the landing midway between the first and second floors. Carter asked defendant whether he had a problem and defendant responded “no problem.” Mary S. testified that defendant told his brother he had to get something and would be back, and then he descended the remaining stairs and entered his apartment. Moments later, she heard a door open and defendant’s wife say: “No, don’t do it. Don’t do it.” Defendant responded: “Let me go. Let me go. I’m going to kill this black * * Defendant proceeded up the stairs carrying a sawed-off shotgun. Carter tried to run up the stairs but defendant’s brother blocked his path. Defendant then shot Carter in the chest and Carter collapsed on the landing.
 

 Three police officers who heard the gunshot ran into the lobby where they discovered defendant standing near the bottom of the stairs. After they repeatedly directed defendant to drop his weapon, the officers disarmed him. A firearms expert who later examined the shotgun testified that it was in proper working order and could not have fired unless someone had cocked it and pulled the trigger. The People also offered forensic evidence that, based on the nature of the wound, Carter was seven or eight feet away from the gun when he was fatally shot.
 

 Defendant’s trial testimony relating the events of that morning generally corresponded with that of Mary S. and the Santiagos until the verbal exchange with Carter on the stairwell. According to defendant, after he told Carter there was “no problem,” he went into his apartment. About 40 minutes later, someone began banging on his door with such force that he
 
 *179
 
 feared the lock would give way. He asserted that, two weeks earlier, someone had knocked his door down while he and his family were not at home. He had been told by another building employee that the damage was inflicted by drug dealers who frequented the building.
 

 Defendant and the building manager, who testified on his behalf, claimed the building was plagued by illegal drug activity. They contended that the front door of the building was missing and that the lock on the security gate had to be replaced on a daily basis because drug dealers would break the lock and use vacant apartments for their transactions. Although defendant testified that he had never seen Carter sell drugs, he believed that Carter was involved in drug activities in the building.
 

 When the banging stopped, defendant retrieved a sawed-off shotgun from his closet. He asserted that he had found the gun in the basement months before but did not know it was loaded and did not know how to fire it. Carrying the shotgun, he stepped into the lobby and walked toward the stairwell when Carter jumped him from behind. In the course of this altercation, Carter grabbed the stock of the gun and pulled him up several stairs. Defendant testified that the gun “went off,” although he had not cocked it and his hand was nowhere near the trigger, and Carter was shot at point blank range. Defendant stated that he turned around in shock and saw the police enter the building. He contended that he complied with police orders and submitted to arrest.
 

 In light of defendant’s testimony that Carter attacked him in the lobby, Supreme Court gave the jury a Penal Law § 35.15 justification defense instruction. However, the court rejected defendant’s request for an instruction that defendant had no duty to retreat from Carter’s aggression because he was in his dwelling when the altercation occurred. Defendant was convicted of manslaughter in the first degree and criminal use of a firearm in the first degree and sentenced to 121/2 to 25 years for each offense, to be served concurrently. On appeal, the Appellate Division affirmed the conviction but modified the sentence to concurrent terms of 10 to 20 years. We now affirm.
 

 The sole issue on appeal is whether Supreme Court erred in denying defendant’s request for a “no duty to retreat” instruction under Penal Law § 35.15 (2) (a) (i). Penal Law § 35.15 was enacted in 1965 when the Penal Law was reorganized and substantially revised (see L 1965, ch 1030). The provision
 
 *180
 
 reflects the principle, first established under the common law and long recognized by statute, that deadly physical force may be justified — with no criminal liability — if the deadly force was used in self-defense or in defense of others. Penal Law § 35.15 (1) states that a person may use physical force upon another “when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person.” The use of deadly physical force is prohibited under section 35.15 (2) (a) in the circumstances set forth in subdivision (1) unless the person “reasonably believes that such other person is using or about to use deadly physical force.” Even then, deadly physical force is not justified if the person knows he or she can avoid the use of force by retreating with complete safety. The statute contains only one exception: there is no duty to retreat if a person is “in his [or her] dwelling and not the initial aggressor” (Penal Law § 35.15 [2] [a] [i]).
 

 Pivotal to defendant’s argument is his contention that the lobby and stairwell areas were part of his dwelling. Although this Court has addressed the Penal Law § 35.15 justification defense many times
 
 (see e.g. People v Russell,
 
 91 NY2d 280 [1998];
 
 Matter of Y.K.,
 
 87 NY2d 430 [1996];
 
 People v Goetz,
 
 68 NY2d 96 [1986];
 
 People v Berk,
 
 88 NY2d 257,
 
 cert denied
 
 519 US 859 [1996]), we have never interpreted the meaning of the term “dwelling” in section 35.15 (2) (a) (i). Section 35.15 does not contain a definition, although the term is defined and used elsewhere in the Penal Law. Most notably, Penal Law § 35.20, which describes when a defendant may use force to prevent or terminate a criminal trespass or burglary, refers to “dwelling” and incorporates various definitions from article 140 of the Penal Law, the article addressing burglary offenses
 
 (see
 
 Penal Law § 35.20 [4] [a]). There, “dwelling” is defined as “a building which is usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]). In turn, “building” includes “any structure, vehicle or watercraft used for overnight lodging of persons, or used by persons for carrying on business therein * * *” and, of particular relevance here, “[w]here a building consists of two or more units separately secured or occupied, each unit shall be deemed both a separate building in itself and a part of the main building” (Penal Law § 140.00 [2]). Noting that the lobby of the apartment building fell within the article 140 definition of building and therefore meets the definition of dwelling, defendant urges
 
 *181
 
 this Court to rely on these definitions to define dwelling in Penal Law § 35.15 (2) (a) (i). This we decline to do.
 

 In instances where a word is not defined in a Penal Law provision under review, we have cautioned against reliance upon a definition of that term found in another Penal Law statute absent legislative authority for doing so
 
 (see People v McNamara,
 
 78 NY2d 626 [1991] [declining to rely on definition of “public place” contained in Penal Law article 240 to inform the use of that term in Penal Law article 245];
 
 see generally People v Powell,
 
 54 NY2d 524 [1981]). Penal Law § 35.20, the defense of premises provision, explicitly refers to the definitions set forth in article 140, but such a reference is conspicuously absent from section 35.15 (2). Although the Legislature modified the justification scheme when it enacted section 35.20 in 1968, it did not conform the language of the two statutes by adding a reference to the article 140 definitions in section 35.15
 
 (see
 
 L 1968, ch 73;
 
 see generally
 
 1968 NY Legis Doc No. 29, at 7-9). This suggests that the Legislature chose not to incorporate the definitions in section 35.15.
 

 In
 
 Powell
 
 (54 NY2d at 529), we disapproved the practice of importing definitions from other Penal Law provisions because “[t]he spirit and intent of the various other statutes relied upon, as well as their language, differ[ed] materially * * * from that of the gun control law” under review in that case. That rationale applies here. Penal Law § 35.15 (2) involves the grave circumstance when a person is justified in using deadly physical force without first exhausting all known avenues of retreat or escape. Penal Law article 140 addresses a different concern — when a person may be charged with burglary and related offenses. The interests underlying article 140 are implicated when a defendant pursues a section 35.20 defense predicated on evidence that the person subjected to force was committing a criminal trespass or burglary at the time of the incident. But those interests are not implicated when a defendant raises a section 35.15 defense which is available even when the person subjected to force was lawfully present on the property. The significance of this distinction is evident in this case: defendant could not rely on section 35.20 because Carter was a guest of a tenant but he was nonetheless entitled to present a section 35.15 defense. Therefore, the meaning of the word “dwelling” in Penal Law § 35.15 (2) (a) (i) cannot be determined merely by incorporating the definitions in article 140.
 

 Because section 35.15 was part of an omnibus package of legislation, there is no specific legislative history underlying
 
 *182
 
 the adoption of section 35.15 (2) (a) (i). The legislation was drafted by the Temporary Commission on Revision of the Penal Law and Criminal Code. According to Richard Denzer and Peter McQuillan, the Commission’s Executive Director and Counsel, section 35.15 (2) (a) was a reaffirmation of traditional self-defense principles and a rejection of a 1940 decision of this Court that suggested a person attacked on a public street had no duty to retreat
 
 (see
 
 Denzer and McQuillan, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 35.15, at 64 [1967 ed];
 
 cf. People v Ligouri,
 
 284 NY 309 [1940]).
 

 Denzer and McQuillan cite
 
 People v Tomlins
 
 (213 NY 240 [1914]) as representative of the application of the traditional rule which section 35.15 (2) (a) (i) was intended to codify. There, this Court reversed a conviction because the trial court erroneously charged the jury that a man who killed his son in the cottage they shared had a duty to retreat before using deadly physical force. Then-Judge Cardozo eloquently described the “no duty to retreat” exception as follows:
 

 “It is not now, and never has been the law that a man assailed in his own dwelling, is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home * * * Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home”
 
 (Tom
 
 lins,, 213 NY at 243).
 

 Tomlins
 
 discussed
 
 People v Sullivan
 
 (7 NY 396 [1852]), a case involving the use of deadly physical force by one boardinghouse resident against a fellow resident on the common stairwell inside the boardinghouse.
 
 Sullivan
 
 held that defendant had a duty to retreat to his room to avoid the altercation, thereby implicitly holding that the common stairwell was not part of defendant’s home or dwelling for purposes of the “no duty to retreat” rule. The
 
 Tomlins
 
 Court distinguished
 
 Sullivan
 
 but did not disturb the holding. Neither decision, however, precisely defines what constitutes a person’s dwelling.
 

 In our view the word “dwelling,” as used in Penal Law § 35.15 (2) (a) (i), refers to a person’s residence, and any definition of the term must therefore account for a myriad of living arrangements, from rural farm properties to large apartment buildings. For purposes of section 35.15, the determination of whether a particular location is part of a defendant’s dwelling
 
 *183
 
 depends on the extent to which defendant (and persons actually sharing living quarters with defendant) exercises exclusive possession and control over the area in question. The term encompasses a house, an apartment or a part of a structure where defendant lives and where others are ordinarily excluded — the antithesis of which is routine access to or use of an area by strangers.
 

 Considering the evidence in this case in the light most favorable to defendant and crediting, as we must, his testimony that he was attacked in the lobby, we conclude defendant was not entitled to a “no duty to retreat” jury instruction. The lobby and stairwell areas were used multiple times each day by tenants of the six-story apartment building and their guests. These areas were not under defendant’s exclusive possession and could not fairly be characterized as defendant’s living quarters. Accordingly, the lobby and common stairwell were not part of defendant’s dwelling and Supreme Court did not err in declining to give a section 35.15 (2) (a) (i) charge.
 

 In so holding, we have not followed the reasoning of the Appellate Division, which focused on the degree of security in the lobby and found that, because the lock on the building’s front gate was broken on the day of the incident, the area was accessible to the general public and defendant therefore had a duty to retreat. Whether a person is entitled to the benefit of the “no duty to retreat” rule should not turn on how well protected the area in question is at the time of the attack. Such an approach would require a person to assess the security status of an area before deciding whether to attempt a retreat or to stand ground and resist an aggressor. Inequities in application of the rule would undoubtedly arise due to the greater likelihood that residents in secure buildings with locked doors and security guards would be afforded the benefit of the “no duty to retreat” charge while persons living in buildings without such protections and who may have more reason to feel threatened in their buildings would be denied the benefit of the charge. Here, for example, it is undisputed that both defendant and Carter had a right to be in the lobby at the time of the incident. Because the altercation would not have been avoided had a locked door or gate prevented intruders from entering the building, defendant’s duty to retreat in the face of attack should not and does not rest on the presence or absence of such security devices.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 
 *184
 
 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order affirmed.