*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0511**

State of Minnesota,
Respondent,

vs.

Christian Mccary Mayo,
Appellant.

**Filed March 14, 2016
Affirmed
Rodenberg, Judge**

Carver County District Court
File No. 10-CR-13-403

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Mark Metz, Carver County Attorney, Kelsey L. Scanlon, Assistant County Attorney, Chaska, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Rodenberg, Judge; and Hooten, Judge.

# UNPUBLISHED OPINION

**RODENBERG**, Judge

On appeal from his felony-assault conviction, appellant argues that the district court erred by instructing the jury that appellant had a duty to retreat if reasonably possible before

acting in self-defense in his front yard. Appellant also contends that the state failed to prove beyond a reasonable doubt that he was not acting in self-defense, that his conviction of an included offense was improperly handled, and that the district court erred by denying his motion for a downward departure from the sentencing guidelines. Because we decline, in our role as an error-correcting court, to extend the castle doctrine to the yard outside of a person's home, and because we see no reversible error regarding the other issues raised by appellant, we affirm.

## FACTS

This case arises from appellant Christian Mayo stabbing his friend, M.H., on May 6, 2013 in the front yard of the home where appellant lived with his parents. In the late afternoon of that day, appellant left a movie theater with his parents and his then-girlfriend, S.B. He and S.B. then went to a pub in Chanhassen. Appellant had about three alcoholic drinks within 90 minutes. This upset S.B., who drank no alcohol at the pub, because they had earlier agreed that appellant would not drink alcohol that day. The two argued.

Appellant called M.H. and asked for a ride home from the pub. M.H. arrived in his car, and appellant and S.B. got into his car. M.H. drove, appellant sat in the passenger seat, and S.B. sat in the back seat. As they drove away, M.H. and S.B. were upset to realize that appellant left the pub without paying his tab. Appellant claimed that he was a regular customer at the pub, that he had forgotten to pay in the past, and that it had not been a problem to pay on his next visit. S.B.'s brother, who worked at a theater attached to the pub, called S.B. and notified her that appellant's tab needed to be paid immediately. S.B. paid the tab over the phone using her credit card. S.B. and appellant argued loudly during

2

the car ride. S.B. told appellant more than once that she wanted to end their relationship. Appellant felt that M.H. was also annoyed that S.B. was with him, because M.H. had "an agenda" that did not include her, namely that appellant would show him a place to grow outdoor marijuana.

Appellant testified that M.H. casually showed him pictures of a buck knife and a handgun during the ride. S.B., who by the time of the trial was no longer involved in a relationship with appellant, testified that appellant and M.H. discussed weapons while looking at pictures on M.H.'s cell phone during the ride. M.H., however, testified that there was no discussion of weapons and that he did not show appellant pictures of weapons during the car ride. Appellant and S.B. testified that the two men smoked marijuana during the car ride. M.H. admitted that he had marijuana in his possession, but denied that he or anyone smoked marijuana in his car that evening.

Tensions elevated as the three approached appellant's residence. While M.H. drove slowly, appellant attempted to get out of the car. The door struck a mailbox as appellant opened it, enraging M.H. Appellant and S.B. got out of the car and walked toward appellant's home, which was by that time less than a block away. M.H. stopped the car and got out to look at the minor damage to his car door. He demanded that appellant pay for the damage. The two men yelled and swore at each other as appellant walked away with S.B. toward the house.

M.H. got back into his car and drove beside appellant and S.B. as they walked, yelling at appellant about the damage to his car door. Some neighborhood witnesses testified that M.H. was driving aggressively and apparently attempting to intimidate

3

appellant and S.B. as they walked. Appellant testified that he believed M.H. was "irate," and that he felt threatened. M.H. threw a glass pipe (apparently belonging to appellant) out of the car. It landed on the street and shattered near appellant and S.B. M.H. drove past the couple and reappeared moments later in front of appellant's residence just as appellant and S.B. crossed the yard and approached the front door of the house. S.B. immediately entered the house through the front door.

Appellant and M.H. stood facing each other across the yard, appellant near the front door of the house and M.H. near the curb at the edge of the yard. A neighbor testified that he heard appellant say something about getting off of his property and heard M.H. say something about damage to his car.

Appellant and M.H. each testified that he stood still as the other charged toward him. Appellant testified that he knew that M.H. normally carried a two-inch knife on his keychain, and that he saw M.H. reach with his right hand toward his pocket. Appellant testified that he stood still and was leaning back as M.H. charged toward him, that he never grabbed M.H., and that he pulled out his own knife at the last second in self-defense.

M.H. said that his intent was to talk to appellant and appellant's parents about paying for the damage to his car, but that appellant suddenly reached into his pocket and pulled out a four-and-a-half-inch switchblade knife, released the blade, and charged toward M.H. M.H. testified that appellant grabbed the front of M.H.'s shirt with his left hand, pulled M.H. in, and reached around with the knife in his right hand to stab M.H. in the left side of the back.

After stabbing M.H. once, and with no other physical fighting, appellant quickly turned and entered the front door of his home. He locked the door. M.H. got into his car and drove about a block before realizing that he was bleeding profusely, felt lightheaded, and was short of breath. M.H. threw a bag of marijuana out the car window before backing up to park in front of a house a short distance from appellant's residence, where he could see people in the yard nearby. M.H. got out of the car, yelled for help, and collapsed on the grass. One of appellant's neighbors called 911, and M.H. was transported to the hospital by ambulance. Police found appellant in his home and arrested him. Appellant had disassembled the knife and hidden it in a hole in the wall inside his bedroom closet, but quickly disclosed its location to police officers, who retrieved it in three pieces from the wall.

M.H. was treated for a collapsed lung and bleeding in his chest cavity. After a time, and despite some setbacks, he recovered.

Although appellant initially denied stabbing anyone, he later admitted to the basic facts of the stabbing. He was charged with first- and second-degree assault and pleaded not guilty, claiming that he stabbed M.H. in self-defense, and in defense of his home, his mother, and S.B.[1]

_____

[1] Although appellant gave notice of them, he did not produce evidence to substantiate his defense-of-dwelling or defense-of-others claims at trial, and he does not argue either of these issues on appeal. *See State v. Penkaty*, 708 N.W.2d 185, 201 n.5, 207 (Minn. 2006) (considering the umbrella of self-defense claims including defense of dwelling and defense of others, a defendant "does not bear the burden of proof . . . [but] does bear the burden of production"). No defense-of-dwelling or defense-of-others jury instructions were requested or given.

5

M.H., having been reluctant to cooperate with the investigation because of his own actions that evening, appeared at trial under subpoena. After invoking his Fifth Amendment privilege against self-incrimination, M.H. was granted immunity from prosecution, and he testified to his version of the events.

The parties disagreed at trial concerning the appropriateness of a jury instruction stating that appellant had a duty to retreat if reasonably possible before acting in self-defense. *See* 10A *Minnesota Practice*, CRIMJIG 7.08 (2014). Appellant argued that he had no duty to retreat, because the front yard is a part of the premises of his home, qualifying him for the castle-doctrine exception to the duty to retreat. The state argued that the duty to retreat if reasonably possible applies at all times when a person is outside of the person's actual dwelling. The district court stated,

> I have reviewed the case law and it is appropriate that the duty-to-retreat instruction be given. Of course that's a factual argument that the defense can make whether or not that retreat was required under the circumstances, but under the caselaw that duty to retreat applies when outside of the home so that instruction will be given.

Shortly thereafter, the district court instructed the jury: "Self-defense retreat. The legal excuse of self-defense is available only to those who act honestly and in good faith. This includes the duty to retreat or avoid the danger if reasonably possible."

The jury returned guilty verdicts for first-degree assault and second-degree assault, implicitly rejecting appellant's self-defense claim. The district court sentenced appellant to 84 months in prison for first-degree assault, acknowledging that this sentence was at the "low end of the box" but within the presumptive range according to the Minnesota

6

Sentencing Guidelines. The district court considered and denied appellant's motion for a downward dispositional departure from the guidelines, referring to the then-recent Minnesota Supreme Court case *State v. Soto*, 855 N.W.2d 303, 308 (Minn. 2014) (holding that a sentencing court must assign a sentence within the presumptive range "'unless there exist identifiable, substantial, and compelling circumstances' that distinguish a case") (quoting Minn. Sent. Guidelines 2.D.1 and citing *id.* cmt. 2.D.103 (2012)). The district court expressly declined to adjudicate appellant guilty of second-degree assault, and stated "that verdict will simply be preserved." This appeal followed.

## D E C I S I O N

### I. Duty to retreat and the castle doctrine

Appellant contends that the district court erroneously instructed the jury that he had a duty to retreat, and that a new trial is therefore required.

District courts have broad discretion to craft jury instructions, but "a jury instruction is erroneous if it materially misstates the law." *State v. Devens*, 852 N.W.2d 255, 257 (Minn. 2014). Whether the duty to retreat applies in a particular case is a question of law that receives de novo review on appeal. *Id.* An erroneous duty-to-retreat instruction may constitute reversible error affecting substantial rights. *See State v. Baird*, 654 N.W.2d 105, 113-14 (Minn. 2002) (affirming an order for a new trial based on an unobjected-to, erroneous duty-to-retreat instruction under the plain-error test). A defendant has the burden of production in asserting a claim of self-defense and must provide evidence supporting the claim. *State v. Soukup*, 656 N.W.2d 424, 429 (Minn. App. 2003).

7

Minnesota has codified the authorized use of force at Minn. Stat. § 609.06 (2014). The Minnesota Supreme Court has interpreted § 609.06, subd. 1(3), the codification of self-defense, as requiring evidence that (1) the defendant was not an aggressor and did not provoke the alleged victim; (2) defendant had an actual and honest belief of imminent danger; (3) a reasonable basis existed for this belief; and, (4) reasonable means to retreat or otherwise avoid physical conflict were not available. *Devens*, 852 N.W.2d at 258 (quotation omitted).

Evidence of the fourth element is not required, however, when one asserts a claim that he acted in self-defense in his home. *State v. Glowacki,* 630 N.W.2d 392, 402 (Minn. 2001). This exception to the duty to retreat, known as the castle doctrine, is premised on the principle that a person's home is his place of greatest safety, and the law therefore does not expect or require a person to retreat from his home. *Devens*, 852 N.W.2d at 258; *see also Glowacki*, 630 N.W.2d at 401-02. Conversely, "if a person is outside his [] home and *can* safely retreat, then the person's use of force is unreasonable as a matter of law." *Devens*, 852 N.W.2d at 258 (emphasis added).

Appellant asks that we extend the castle doctrine to the curtilage of the home—specifically to his front yard. No Minnesota case holds that the castle-doctrine exception to the general rule imposing a duty to retreat if reasonably possible extends to the curtilage and a front yard.

We are mindful of the United States Supreme Court's 1895 opinion addressing the issue of whether the castle doctrine encompasses the curtilage. *See Beard v. United States*, 158 U.S. 550, 15 S. Ct. 962 (1895). The Court in *Beard* ordered a new trial on the basis

8

that the jury was improperly instructed that Beard had a legal duty to retreat from an "orchard lot" located about 50 to 60 yards from his house before acting in self-defense. *Id.* at 552, 563-64, 15 S. Ct. at 962, 967. The Court stated: "[W]e cannot agree that the accused was under any greater obligation when on his own premises, near his dwelling house, to retreat or run away from his assailant, than he would have been if attacked within his dwelling house." *Id.* at 559-60, 15 S. Ct. at 965.

Despite *Beard* and its support for the application of the castle doctrine in the curtilage, we apply Minnesota state law. As the United States Supreme Court stated in 1938,

> Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute *or by its highest court in a decision* is not a matter of federal concern.

*Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938) (emphasis added). Applying the "best law available to us," *State v. Kelley*, 832 N.W.2d 447, 456 (Minn. App. 2013), we are bound by our state supreme court's recent enunciation of Minnesota's narrower exception to the general rule imposing a duty to retreat if reasonably possible before acting in self-defense. *See Devens,* 852 N.W.2d at 258 (declining to extend the castle doctrine and stating that "if a person is outside his or her home and can safely retreat, then the person's use of force is unreasonable as a matter of law").[2]

---

[2] The *Devens* court cautioned against reaching outside of our castle-doctrine caselaw to define the castle, specifically rejecting Fourth Amendment interpretations of curtilage and a burglary-related statutory definition of dwelling. *Devens*, 852 N.W.2d at 259-60, 260 n.6.

*Devens* squarely addressed the parameters and extent of the castle doctrine under Minnesota law. *Id.* Devens claimed self-defense regarding an incident that occurred in the shared hallway of his apartment building. *Id.* The supreme court declined to extend the castle doctrine to the hallway, and held that Devens had a duty to retreat into his apartment unit if reasonably possible before using physical force in self-defense. *Id.* at 260. *Devens* highlighted that the duty to retreat "presumes there is somewhere safer to go—home." *Id.* at 258. While giving some consideration to the role of "exclusive possession and control" in determining the bounds of "home," *Devens* emphasized that the castle doctrine is founded on the principle that the home is a person's "sanctuary," "safest place," and "critical for the protection of the family." *Id.* at 258-59 (quotations omitted). The supreme court cited approvingly to New York's limitation of the castle doctrine to "a house, an apartment or part of a structure where [one] lives and where others are ordinarily excluded—the antithesis of which is routine access to or use of an area by strangers." *Id.* at 259 (quoting *People v. Hernandez*, 98 N.Y.2d 175, 746 N.Y.S.2d 434, 774 N.E.2d 198, 203 (2002)).

Appellant cites *Penkaty* in support of his argument. 708 N.W.2d at 207. In that case, the Minnesota Supreme Court affirmed the district court's conclusion that the front deck was a part of the home for purposes of Penkaty's defense-of-dwelling and self-defense

10

claims. *Id.* at 207. Here, there is no defense-of-dwelling claim, and appellant was not on or in an attached appurtenance to a home at the time of his actions.[3]

Appellant also relies on *State v. Carothers*, in which the supreme court ordered a new trial because the district court erroneously instructed the jury that the duty to retreat applied to a defense-of-dwelling claim. 594 N.W.2d 897, 904 (Minn. 1999). As concerns the duty to retreat, the law governing defense of dwelling is distinct from the law governing self-defense. *See Penkaty*, 708 N.W.2d at 207 (explaining that while there is a general duty to retreat before acting in self-defense, "there is no duty to retreat when acting in defense of dwelling"); *see also Carothers*, 594 N.W.2d at 901 ("a duty to retreat is inconsistent with the authority to prevent the commission of a felony in one's home").

Appellant also cites *State v. McCuiston*, 514 N.W.2d 802 (Minn. App. 1994), *review denied* (Minn. June 15, 1994). But *McCuiston* also addressed a defense-of-dwelling claim, and McCuiston's adversary was on the porch (an attached appurtenance, as was the case in *Penkaty*, and distinguishable from a yard). *Id.* at 804-06.

In *State v. Clayborne*, we held that a duty-to-retreat jury instruction was proper, and that the castle doctrine did not apply, where the victim stood just inside the gate of a fenced yard while the defendant stood inside the house and shot a gun out the front door. 404 N.W.2d 385, 387 (Minn. App. 1987), *review denied* (Minn. May 28, 1987). *Clayborne* relied on a much earlier opinion with nearly identical facts. *See State v. Touri*, 101 Minn.

---

[3] And it is also worth noting that *Penkaty* was a complex case that fundamentally hinged on other issues and in which the castle doctrine received relatively little commentary. *See id.*

370, 373, 112 N.W.2d 422, 423 (1907). *Clayborne* and *Touri* are highly apposite here, demonstrating that even while a defendant's adversary is on defendant's property, a defendant has a duty to avoid violence by retreating into his home so long as it is reasonably possible.

Appellant also relies on an early Minnesota case in which the supreme court ordered a new trial because the district court gave a duty-to-retreat instruction. *State v. Gardner*, 96 Minn. 318, 104 N.W. 971 (1905). But, contrary to appellant's argument, *Gardner* hinged not on the location of the shooting but on the practicability of retreat. *Id.* at 327-28, 104 N.W. at 975. The castle doctrine was not at issue in *Gardner*, because the alleged assault occurred on the property of the alleged victim and not on the defendant's property. *Id.* In assessing whether a duty to retreat applied, the *Gardner* court analyzed the posture and stature of the two opponents, the weapons involved, and the words exchanged just before the shooting. *Id.*

In *Devens*, the Minnesota Supreme Court confined the meaning of one's "castle" to the home itself, the sanctuary from which there is no further retreat. It is clear from this record that appellant had not fully retreated into that sanctuary. Notably, and by all accounts, appellant was nearer the front door than was M.H., and there was no barrier or reason that appellant could not have followed S.B. into the house.[4]

The duty to retreat is a long-standing and important principle, as is the castle-doctrine exception to that duty. But no Minnesota case holds that the castle includes the

---

[4] We express no opinion concerning application of the castle doctrine to any other set of facts in any future case, and confine our analysis to the facts of this case.

courtyard.  We, as an error-correcting court, decline to redefine the parameters of the castle doctrine on these facts.  As an error-correcting court, "we apply the best law available to us." *Kelley*, 832 N.W.2d at 456.  Doing so, we conclude that the district court appropriately instructed the jury that appellant had a duty to retreat from his front yard into his residence if reasonably possible.

## II.     Sufficiency of the state's evidence

Once a defendant has produced evidence to support a self-defense claim, the state has the burden of disproving one or more of the elements beyond a reasonable doubt. *Devens*, 852 N.W.2d at 258.  Appellant contends that the state failed to produce sufficient evidence to disprove any of the elements of self-defense beyond a reasonable doubt.  In so doing, appellant apparently wishes to reargue his case.

Our review of the sufficiency of the evidence after a criminal conviction is limited to a thorough review of the record to determine whether the evidence, when viewed in a light most favorable to the verdict, is sufficient to support it.  *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989).  We do not reweigh the evidence on appeal.  *See State v. Porte*, 832 N.W.2d 303, 308-09 (Minn. App. 2013).  We assume that the jury believed evidence that supports the verdict and disbelieved conflicting evidence.  *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989).  Additionally, "[a]ssessing witness credibility and the weight given to witness testimony is exclusively the province of the jury."  *State v. Pendleton*, 759 N.W.2d 900, 909 (Minn. 2009).  "We will not disturb a verdict if the jury could reasonably conclude, given the presumption of innocence and the requirement of proof beyond a reasonable doubt, that the defendant was guilty of the charged offense."  *Id.*

Appellant's self-defense claim depends almost exclusively on credibility determinations. Identifying the first or primary aggressor, whether appellant's fear of imminent danger was honest and reasonable, and whether in that moment before the stabbing there was a viable means of avoiding violence all depend upon which version of the facts the jury believed. Given testimony in the record that appellant charged at and stabbed M.H. with a switchblade knife, with there being no weapon in M.H.'s hand, the record supports the jury's conclusion.

## III. No conviction for included offense

Appellant contends that he was improperly convicted of an included offense, and asks that we vacate his second-degree assault conviction.

By statute, a criminal defendant "may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04 (2014). "A lesser degree of the same crime" constitutes an "included offense" for purposes of this provision. *Id.*, subd. 1(1); *see State v. Hackler*, 532 N.W.2d 559, 559 (Minn. 1995) (holding that second-degree assault is an included offense of first-degree assault on the basis of the same criminal act for purposes of Minn. Stat. § 609.04, despite that proof of the latter does not necessarily prove the former).

The Minnesota Supreme Court has held that, when a jury finds a person guilty of multiple offenses for the same behavioral incident, courts should specify for which conviction a sentence is imposed, refrain from adjudicating (i.e., "accept[ing] and record[ing]") convictions for included offenses, and preserve the guilty verdicts for future reference. *Spann v. State*, 740 N.W.2d 570, 573 (Minn. 2007). Additionally, we have held

14

that an unambiguous, orally-pronounced sentence controls if it varies from a written sentencing order. *State v. Staloch*, 643 N.W.2d 329, 331 (Minn. App. 2002).

Appellant complains that his warrant of commitment reflects two convictions: one for first-degree assault under Minn. Stat. § 609.221, subd. 1 ("inflict[ing] great bodily harm"), and another for second-degree assault under Minn. Stat. § 609.222, subd. 1 ("with a dangerous weapon"). Appellant agrees that the jury found him guilty of both counts, but argues that the district court improperly recorded both convictions.

On the record at the sentencing hearing, the district court clearly stated that "[w]ith respect to Count II, Assault in the Second Degree, because this is a conviction for the same act, I will not formally adjudicate []or sentence you on this count at this time, that verdict will simply be preserved." This conforms precisely with the supreme court's directive in *Spann*. The initial warrant of commitment did reflect two convictions. But, under *Staloch*, the district court's correct handling of the issue on the record governs over any clerical error by court administration. 643 N.W.2d at 331. The district court also later amended the warrant of commitment, adding a handwritten note beside the second conviction: "no formal adjudication or sentence—jury verdict preserved."

In light of the relevant authorities, we see no basis for remand or any other appellate relief. The district court properly convicted appellant only of first-degree assault.

## IV. Sentencing

Appellant contends that the sentencing court abused its discretion by denying his motion for a downward departure from the Minnesota Sentencing Guidelines. "A sentencing court 'must pronounce a sentence within the applicable range unless there exist

15

identifiable, substantial, and compelling circumstances' that distinguish a case and overcome the presumption in favor of the guidelines sentence." *Soto*, 855 N.W.2d at 308 (quoting Minn. Sent. Guidelines 2.D.1 and citing *id.* cmt. 2.D.103). Appellant expressly argues that the district court's error was "denying [his] motion for a downward dispositional departure," but appellant advances both offense-related and offender-related factors, and also argues at points in his principal brief for an unspecified "downward departure."

A downward departure may be permitted if a mitigating circumstance is present. Minn. Sent. Guidelines 2.D.3.a. One potential mitigating factor is that "[t]he victim was an aggressor in the incident." *Id.* cmt. 2.D.203.3.a.1. Appellant contends that the sentencing court erred by mistaking the jury's rejection of appellant's self-defense claim for proof that M.H. was not *an* aggressor in the incident leading up to the stabbing. *See id.* Appellant correctly asserts that, even where a defendant has failed to persuade the jury that he acted in self-defense, the fact that a victim was also an aggressor can serve as a mitigating factor at sentencing. *Id.* 2.D.3.a.5. Here, the sentencing judge slightly misstated the sentencing guidelines:

> I'm allowed to consider under the sentencing guidelines . . . whether the victim was *the* aggressor in this case, and while the victim may have been the aggressor in some ways in this case, the jury determined here beyond a reasonable doubt that your actions were . . . beyond any reasonable response that was appropriate under the circumstances.

(Emphasis added.) The sentencing guidelines allow consideration of whether the victim was "*an* aggressor," not *the* aggressor. *Id.* 2.D.3.a.1.

16

Nevertheless, we see no reversible error in the district court's sentence. First, a careful reading of the entire sentencing record reveals the district court's evident care in pronouncing appellant's sentence, despite this minor inaccuracy. Moreover, the existence of a mitigating factor only permits departure, and never requires departure. Departures from the guidelines are to be employed sparingly and conservatively. *See Soto*, 855 N.W.2d at 308-09. Appellant cites no authority forbidding the sentencing court from considering the jury's verdict in his sentencing decision. The district court acted within its discretion in sentencing appellant at the "bottom of the box," taking into account all of the facts in the record.

Appellant also contends that the district court abused its discretion in denying his motion for a downward dispositional departure because he was a candidate for residential drug treatment. However, the record shows that the sentencing court carefully examined appellant's amenability to probation and determined that he was not particularly amenable. *See id.* at 309. Here again, and exercising evident care in considering the competing sentencing arguments, the district court acted within its discretion in following the sentencing guidelines.

**Affirmed.**