People v Graham (2023 NY Slip Op 01819)

People v Graham

2023 NY Slip Op 01819

Decided on April 6, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 6, 2023

111710
[*1]The People of the State of New York, Respondent,
v
Carlos A. Graham, Appellant.

Calendar Date:February 15, 2023

Before:Garry, P.J., Lynch, Clark, Reynolds Fitzgerald and McShan, JJ.

Paul J. Connolly, Delmar, for appellant.
Joseph Stanzione, District Attorney, Catskill (Denise J. Kerrigan of counsel), for respondent.

Lynch, J.
Appeal from a judgment of the County Court of Greene County (Terry J. Wilhelm, J.), rendered April 4, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, grand larceny in the third degree, concealment of a human corpse and tampering with physical evidence (two counts).
On February 6, 2018, police executed a search warrant at 124 Tool House Road in the Town of Catskill, Greene County in connection with a missing persons case. During the search, police discovered a corpse (hereinafter the victim) and guns buried with cement in a crawl space beneath the residence. Defendant — who was staying at the residence with the tenant, Sade Knox, at the time of the search — was charged by indictment with murder in the second degree, conspiracy in the second degree, criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, grand larceny in the third degree, concealment of a human corpse and tampering with physical evidence (two counts). Prior to trial, defense counsel filed an omnibus motion seeking various relief and defendant filed a pro se motion challenging the February 6, 2018 search, arguing, among other things, that the search of the crawl space exceeded the scope of the authorizing search warrants and the warrants were invalid because they were "not signed until after the search was initiated and the evidence was already seized." Following a hearing, County Court, as relevant here, denied defendant's suppression motion and the People thereafter withdrew the conspiracy count. At the ensuing trial, the jury rejected defendant's justification defense and convicted him of all remaining counts. He was sentenced, as a second felony offender, to several concurrent and consecutive prison terms, culminating in an aggregate prison sentence of 35 years to life, plus postrelease supervision. Defendant appeals.
Defendant argues that the verdict on counts 1, 2, and 4 — murder in the second degree and criminal possession of a weapon in the second and third degrees, respectively [FN1] — is against the weight of the evidence because the People did not disprove his justification defense beyond a reasonable doubt. We reject this argument outright as it pertains to counts 2 and 4, as "there are no circumstances when justification can be a defense to the crime of criminal possession of a weapon" (People v Pons, 68 NY2d 264, 267 [1986] [internal citation omitted]; see People v Williams, 36 NY3d 156, 161 [2020]).[FN2] As for count 1, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]). Where, as here, a defendant advances a justification defense regarding the use of deadly physical force, "the People are obliged to 'demonstrate 
beyond a reasonable doubt that [he or she] did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary' " (People v Hodgins, 202 AD3d 1377, 1379 [3d Dept 2022], quoting People v Umali, 10 NY3d 417, 425 [2008], cert denied 556 US 1110 [2009]; see Penal Law § 35.15 [2] [a]).
The trial evidence established that the victim went missing on January 27, 2017. Knox, the victim and defendant were neighbors at that time, each residing in adjacent units on Tool House Road in the Town of Catskill.[FN3] Although Knox — who lived in unit 124 — had previously been in a relationship with the victim, she was dating defendant at the time of the victim's disappearance. Police located the victim's body in a crawl space beneath Knox's residence approximately 13 months later. As for the circumstances surrounding the victim's disappearance, the victim's former girlfriend and mother both testified that they received a telephone call from the victim on January 26, 2017 canceling preexisting plans to bring his child to an event the next day. Both witnesses recalled the victim sounding upset and hurried on the phone, with the former girlfriend recounting his statement that he had "heard something that messed up his head." Although these witnesses did not know what the victim was upset about, testimony from Knox's sister demonstrated that, shortly before the killing, the victim was upset after hearing that defendant and Knox were romantically involved. A missing persons report was filed following the victim's disappearance and, within a few days, police located the victim's car at the Mohegan Sun casino in Connecticut. The People presented evidence that defendant — along with Knox and an individual named Ashton Adams — had driven the car to that location on January 27, 2017. Defendant called a friend from Catskill to pick the group up and drive them back home; however, when the friend arrived with his brother-in-law, defendant and the group opted to take a taxi home. The friend testified that defendant later told him that the victim would "never" come back.
As for defendant's role in the victim's disappearance, the People relied on testimony from Bryce Hallbeck, a longtime acquaintance. Hallbeck testified that she received a call from defendant shortly before the killing, asking to speak with her in person. Defendant met Hallbeck at a designated location, showing up with Knox and Adams, and told her he "needed a revolver handgun" because "he was in fear that [the victim] was going to kill him if he found out that he was sneaking around with [Knox]." Hallbeck gave defendant a .357 caliber revolver and he clicked the trigger and checked the safety to make sure it worked. Hallbeck testified that defendant then relayed a plan for Knox to coax the victim to her residence and "rock[ ] him to sleep," after which defendant would sneak in and kill him. According to Hallbeck, defendant requested 
the revolver because that weapon does not leave shell casings behind. When the police searched the crawl space on February 6, 2018, they found the victim's body buried in cement inside of a garbage bag. The victim's legs were wrapped in duct tape, he did not have pants or shoes on, and he did not possess any of the jewelry that he typically wore. Police also recovered a .357 caliber revolver with a broken grip, a 10 gauge shotgun and a 12 gauge round of ammunition.
Defendant took the stand at trial, conceding that he shot and killed the victim and then hid the evidence by burying the guns with the victim's body in the crawl space beneath Knox's residence. However, he refuted Hallbeck's testimony that he did so in furtherance of a premeditated plan to murder the victim, maintaining that he procured the .357 caliber revolver on behalf of Adams — who was afraid of the victim — in the event they encountered the victim and needed to defend themselves, and that this is precisely what occurred on the night of the incident. More particularly, defendant testified that he, Knox and Adams were hanging out at Knox's residence when she received a phone call from the victim stating that he wanted to come over. According to defendant, the victim shortly thereafter kicked the door to Knox's home and yelled "[b]***h come open this f*****g door." Defendant explained that Adams ran to hide in Knox's bedroom closet, while defendant stood between the closet and a fish tank. Defendant testified that the glass in the bedroom window shattered and he saw "a flashlight and a [green] laser" being pointed through the window. Defendant then grabbed a shotgun and a shell that he kept under the victim's bed and joined Adams in the closet, explaining that, although he kept both 12 and 10 gauge shells under the bed, he did not look to see which one he had grabbed. While in the closet, defendant heard the victim raucously enter the house, assault Knox, rummage through cabinets and state that he was going to kill defendant. Although Adams was in possession of the .357 caliber revolver defendant had received from Hallbeck at the beginning of the encounter, defendant explained that he took it back because he was uncertain whether the shotgun would work in the event he grabbed the wrong shell.
According to defendant, the victim entered Knox's bedroom, looked toward the closet and began to point a shotgun at him. Defendant testified that he jumped out of the closet and the .357 caliber revolver went off unintentionally, but he believed the bullet missed the victim. Defendant then deliberately fired the shotgun, striking the victim. Maintaining that the victim was still coming at him at this point, defendant testified that he then struck the victim on the forehead with the .357 caliber revolver, causing the victim to fall backwards and die. When asked why he did not call the police, defendant explained that he did not think they would believe that he acted in self-defense. He acknowledged 
burying the victim's body, with the weapons, in the crawl space, and testified that he gave the victim's gun to a person he knew, who promised to compensate him. Roger Chapman, a childhood friend of defendant who was incarcerated in the same jail, testified that, in or around February or March 2018, defendant told him that he had acted in self-defense and recounted how the victim came over to Knox's residence displaying threatening behavior. Defendant also told Chapman that he, Knox and Adams took jewelry and money from the victim's residence after the shooting. To that end, the People presented evidence that in February 2017, a Google account associated with defendant's email address searched for "shotgun suicide" and looked up the price of gold.
During an autopsy of the victim's body, a bullet was recovered from the victim's thoracic cavity and four round projectiles were found in the outer tissues of his chest. A firearms expert testified that the bullet recovered from the victim's thoracic cavity could have been fired from a .357 caliber firearm and that the four round metallic objects recovered from the victim's chest were consistent with a shot from a 10 gauge weapon. The pathologist who performed the autopsy explained that the bullet to the thorax caused a chest hemorrhage that ultimately killed the victim, but acknowledged that the victim might have been able to shoot a weapon even after being shot since his heart could have continued to function. There was also evidence that a 12 gauge round is capable of being fired from a 10 gauge shotgun, but doing so presents a risk of injury to the shooter.
On this record, a different verdict would not have been unreasonable given defendant's testimony that he shot the victim after the victim violently entered Knox's house, assaulted Knox, threatened to kill defendant and pointed a gun at him, along with the proof that the victim canceled preexisting plans for January 27, 2017 because he was upset after learning that Knox was dating defendant. Some of the physical evidence also supported the version of events as portrayed by defendant, including a photograph taken on February 6, 2018 depicting a door at Knox's residence with a longitudinal crack on the narrow side spanning from the deadbolt to the knob. The testimony also demonstrated that one of the windows in Knox's room contained a plexiglass pane that the owner of the residence did not install and that the victim had purchased two shotguns and a "green laser sight" in 2015. Nevertheless, the jury heard testimony from Hallbeck casting doubt on defendant's self-defense claim, including that defendant relayed a premeditated plan to kill the victim. Based upon the foregoing, coupled with defendant's admitted cover-up of the evidence, the jury could readily discredit defendant's version of the encounter and choose to believe Hallbeck. Although defendant challenges the reliability of Hallbeck's testimony due to certain issues bearing on her credibility, Hallbeck was extensively cross-examined in this respect and the jury ultimately chose to believe her version of the events notwithstanding these issues. When deferring to the jury's credibility determinations and "weigh[ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn" therefrom (People v Santiago, 206 AD3d 1466, 1467 [3d Dept 2022] [internal quotation marks and citations omitted]), we conclude that the People disproved defendant's justification defense beyond a reasonable doubt and the verdict on the murder charge is not against the weight of the evidence (see People v Infinger, 194 AD3d 1183, 1187 [3d Dept 2021], lv denied 37 NY3d 965 [2021]; People v Every, 146 AD3d 1157, 1162 [3d Dept 2017], affd 29 NY3d 1103 [2017]).
We are also unpersuaded by defendant's claim that the verdict on the charge of grand larceny in the third degree is against the weight of the evidence because the People did not prove that he intended to permanently deprive the victim or his estate of his vehicle. As relevant here, a person is guilty of grand larceny in the third degree when "he or she steals property and . . . the value of the property exceeds [$3,000]" (Penal Law § 155.35 [1]). "A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself[, herself] or to a third person, he [or she] wrongfully takes, obtains or withholds such property from an owner thereof" (Penal Law § 155.05 [1]). "To deprive another of property means (a) to withhold it or cause it to be withheld from him [or her] permanently . . . , or (b) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property" (Penal Law § 155.00 [3] [internal quotation marks omitted]). "Larcenous intent is rarely susceptible of proof by direct evidence, and must usually be inferred from the circumstances surrounding the defendant's actions" (People v Khalil, 206 AD3d 1300, 1305 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1188 [2022]). The evidence that defendant moved the victim's vehicle — a Cadillac Escalade valued at $7,500 — across state lines in connection with a murder that he tried to cover up was more than sufficient to conclude that defendant had the intent to permanently deprive the victim's estate of the vehicle or to dispose of it "under such circumstances as to render it unlikely that an owner w[ould] recover such property"(Penal Law § 155.00 [3]).
Nor are we persuaded by defendant's argument that County Court erred in denying his motion to suppress the evidence seized from the crawl space. Contrary to defendant's contention, the search warrant applications submitted by law enforcement — which included detailed affidavits from an investigator highlighting the evidence police had gathered during the course of their lengthy investigation — 
established probable cause to believe that evidence related to the missing persons case would be found at 124 Tool House Road (see People v Jackson, 206 AD3d 1244, 1246 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]). To the extent defendant raises the same Aguilar-Spinelli challenge he asserted below, County Court properly rejected it. The affidavits submitted by law enforcement in connection with the warrant applications included information from two confidential informants (hereinafter CIs) who recounted an October 2017 discussion with Knox in which she indicated that relevant evidence was buried under her residence. Insofar as the CIs gave consistent accounts of the conversation and revealed certain information that had already been independently corroborated by law enforcement, County Court did not err in concluding that the warrant applications sufficiently established the CIs' basis of knowledge and reliability (see People v Myhand, 120 AD3d 970, 974 [4th Dept 2014], lv denied 25 NY3d 952 [2015]; People v Mabeus, 63 AD3d 1447, 1452 [3d Dept 2009]). In any event, the warrant applications provided probable cause for issuance of the warrants independent of the information provided by the CIs.
Defendant's related contention that the search of the crawl space exceeded the authority granted by the warrants also lacks merit. The record demonstrates that a duly authorized search warrant was issued on January 26, 2018 permitting a search of the "[g]round [u]nder the [r]esidence at 124 Tool House Road[,] . . . including the areas on or below the flooring," for, among other things, "human remains," "[s]erological evidence," "[a]ny and all weapons" and "[a]ny and all projectiles or shell casings." On February 1, 2018, police applied for an extension of the January 26 warrant, submitting an affidavit from a police investigator explaining that, although police began executing the January 26 warrant on the day it was issued — making entry into the crawl space — they stopped the search upon learning that Knox was on her way back to the residence. In light of this development, Supreme Court (Gilpatric, J.) granted the application and issued two additional warrants on February 2, 2018: one authorizing a search of the ground under 124 Tool House Road and another authorizing a search of the residence.[FN4]
In support of his argument that police lacked authority to search the crawl space under 124 Tool House Road, defendant claims, among other things, that the February 2, 2018 warrants were improperly issued because police did not find any evidence during the January 26 search and, thus, there was no basis to issue additional warrants. This argument is belied by the record, which demonstrates that police stopped the January 26 search before it was finished in order to preserve its secrecy upon learning that Knox was coming back to the residence. They then submitted another warrant application, supported by a detailed affidavit from a police investigator, seeking 
authorization to continue the search. Accordingly, the February 2 warrants were properly issued upon the same probable cause that existed to support the January 26 warrant.
In further support of his challenge to County Court's suppression decision, defendant argues that, even if the February 2, 2018 warrants were validly issued, only the residential warrant was entered into evidence at the suppression hearing and it did not authorize a search of the crawl space. However, the failure to also submit the ground search warrant as an exhibit does not vitiate the propriety of the search. To that end, the residential warrant authorized a search of the residence at 124 Tool House Road, along with "[a]ny and all items which are capable of retaining blood, hair, fiber, or serological evidence" as well as "[a]ny and all weapons." Although the residential search warrant did not list crawl spaces in the description of the premises to be searched (see CPL 690.45 [5]), it specifically authorized a search for serological evidence in "the areas on or below the flooring," and "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search" (United States v Ross, 456 US 798, 820-821 [1982]; see People v Watson, 254 AD2d 701, 701 [4th Dept 1998], lv denied 92 NY2d 1055 [1999]). As such, the search of the crawl space was within the scope of the residential warrant (see People v Watson, 254 AD2d at 701).
Defendant's challenge to the veracity of the February 2, 2018 warrants is also unavailing. There is nothing in the record to support defendant's claim that these warrants were "backdated" and signed "on or after February 6, after the searches were conducted." To the extent that defendant faults his trial attorney for failing to challenge the legality of these warrants in pretrial motion practice — instead requiring defendant to do so in a pro se application — and not attempting to elicit any testimony in this respect during the suppression hearing, defense counsel gave a sound and legitimate reason on the record for failing to do so, explaining that he did not believe such a challenge had any merit. This does not, as argued by defendant, amount to the deprivation of meaningful representation (see People v Caban, 5 NY3d 143, 152 [2005]).
Nor did County Court abuse its discretion in precluding admission of a rap video depicting the victim — a local rap artist — rapping about his use of guns. Relevant evidence may be excluded by the trial court, in its discretion, "if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury" (People v Heiserman, 127 AD3d 1422, 1423 [3d Dept 2015] [internal quotation marks and citation omitted]). In moving to introduce the video, defendant maintained that he had seen it two or three months before 
the incident and that it bore on his justification defense because it was relevant to his state of mind at the time of the shooting. Following an in camera review, County Court precluded the video's admission, finding, in essence, that its probative value was substantially outweighed by the risk of undue prejudice.[FN5] County Court did not abuse its discretion in this respect, as the video — which was produced approximately seven years prior to the underlying incident — was inflammatory, remote in time, posed a risk of prejudice to the People and had limited probative value. We also note that defendant successfully introduced other evidence demonstrating that the victim owned guns prior to the incident and which was relevant to his claim that he was afraid of the victim prior to the shooting (see generally People v Halter, 19 NY3d 1046, 1051-1052 [2012]; People v Gaylord, 194 AD3d 1189, 1191-1192 [3d Dept 2021], lv denied 37 NY3d 972 [2021]).
Next, defendant asserts that the prosecutor made prejudicial statements during summation that deprived him of a fair trial. As recounted above, this jury was presented with competing versions of the events leading to the victim's death. Summation affords counsel the right and opportunity to comment on what logical and reasonable inferences may be drawn from such evidence, and what inferences would be improbable (see People v Forbes, 111 AD3d 1154, 1158 [3d Dept 2013]). Notably, defense counsel only objected at the conclusion of the prosecutor's summation, contending that certain rhetorical commentary characterizing defendant's version of events as "nonsense, absurd, . . . a fairytale, bunch of nonsense" was improper. Counsel further asserted that the prosecutor improperly shifted the burden of proof by arguing that defendant failed to present photographs of any injuries to Knox. A curative instruction was not requested. In the ensuing jury instructions, County Court explained that the People bore the burden of proof beyond a reasonable doubt, not the defendant. No exceptions were taken to the charge as given. Defendant did not otherwise challenge the specific statements he takes issue with in his brief, rendering his claims in this respect unpreserved. In any event, "[c]ounsel is afforded wide latitude during summations" and reversal is warranted only "when a prosecutor's remarks are so egregious . . . that they deprive a defendant of a fair trial" (People v Rupnarine, 140 AD3d 1204, 1205 [3d Dept 2016]). The People concede that some of the prosecutor's statements were "possibly [i]mproper" and would have been better left unsaid. We agree, particularly with respect to the prosecutor's remark that Hallbeck's version of the events was the "true account," for counsel may not vouch for the credibility of a witness (see People v Forbes, 111 AD3d at 1158). And certainly, calling defendant a liar was inappropriate (see People v Shanis, 36 NY2d 697 [1975]; People v Wlasiuk, 32 AD3d 674, 681 [3d Dept 2006], lv dismissed 
7 NY3d 871 [2006]). That said, various statements challenged by defendant "constituted . . . fair comment[ary] on the evidence or were otherwise responsive to defense counsel's summation" (People v Shamsuddin, 167 AD3d 1334, 1336 [3d Dept 2018], lv denied 33 NY3d 953 [2019]; see People v Williams, 163 AD3d 1160, 1165 [3d Dept 2018], lv denied 32 NY3d 1179 [2019]). Based on the overall record, we conclude that the prosecutor's unwarranted rhetoric was not so egregious and pervasive as to compromise defendant's right to a fair trial.
Also unavailing is defendant's assertion that, "[s]ince the jury was not instructed [o]n the duty to retreat," he was prejudiced by the prosecutor's statements on summation suggesting that he could have avoided the shooting by exiting the residence through Knox's bedroom window and defense counsel was ineffective for failing to move to strike the prosecutor's statement in this regard. Defendant benefitted from the fact that County Court did not give a duty to retreat instruction (see Penal Law § 35.15 [2] [a]) and "there is no significant probability that the jury would have inferred and applied any such duty in the absence of [such] an instruction" (People v Jones, 4 AD3d 853, 854 [4th Dept 2004], affd 3 NY3d 491 [2004]). As such, defense counsel's failure to object to the prosecutor's statements regarding the window in Knox's bedroom did not deprive defendant of meaningful representation. In a similar vein, defendant's claim that counsel was ineffective for failing to request a "no duty to retreat" charge also lacks merit. Although defendant testified that he had been "staying" at 124 Tool House Road for two months before the shooting, there was ample evidence refuting the proposition that the premises was his "dwelling" for purposes of the exception to the duty-to-retreat rule enumerated in Penal Law § 35.15 (2) (a) (i) (see People v Hernandez, 98 NY2d 175, 182-184 [2002]; compare People v Berk, 88 NY2d 257, 267 [1996]). Under the circumstances presented, counsel's failure to request such a charge did not amount to ineffectiveness.
As for defendant's challenge to the sentence, we are unpersuaded that it is unduly harsh or severe (see CPL 470.15 [6] [b]), but agree with defendant that County Court erred by not running the sentences on counts 1, 2 and 3 — murder in the second degree and two counts of criminal possession of a weapon in the second degree based upon his possession of the .357 caliber revolver — concurrently. To that end, "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently" (Penal Law § 70.25 [2]). However, when "the elements of the crimes do not overlap or if the facts demonstrate that the defendant's acts underlying the crimes are separate and distinct, 
consecutive sentences may be imposed" (People v Gatchell, 208 AD3d 1549, 1551 [3d Dept 2022] [internal quotation marks and citations omitted]). Here, County Court imposed a prison sentence of 25 years to life on count 1 (murder in the second degree), to run concurrently with the 15-year prison term imposed on count 2 (criminal possession of a weapon in the second degree in violation of Penal Law § 265.03 [1] [b]) and consecutively with the 5-year prison term imposed on count 3 (criminal possession of a weapon in the second degree in violation of Penal Law § 265.03 [3]). The court ran the sentences on counts 2 and 3 consecutively to one another.
We agree with defendant that the sentences on counts 2 and 3 cannot be run consecutively. The conviction on count 2 stemmed from defendant's possession and intent to use an operable, loaded .357 caliber revolver in violation of Penal Law § 265.03 (1) (b) and his conviction on count 3 was based upon his mere unlawful possession of that same firearm in violation of Penal Law § 265.03 (3), regardless of any intent to use the weapon. Insofar as defendant's possession of the weapon was a material element of both weapon possession counts, was part of the same act resulting in the murder, and there was no evidence that defendant possessed the weapon with purposes unrelated to his intent to shoot the victim, the sentence imposed on count 3 is modified to run concurrently with the sentence imposed on count 2 (see People v Jackson, 226 AD2d 476, 477 [2d Dept 1996], lv denied 88 NY2d 987 [1996]; People v Albritton, 204 AD2d 651, 651 [2d Dept 1994], lv denied 84 NY2d 822 [1994]).
County Court also erred in running the sentences on counts 1 and 3 consecutively to one another. "[W]here a defendant is charged with criminal possession of a weapon pursuant to Penal Law § 265.03 (3), as well as a crime involving use of that weapon . . . consecutive sentencing" is allowed "so long as the defendant knowingly unlawfully possesses a loaded firearm before forming the intent to cause a crime with that weapon" (People v Lozada, 164 AD3d 1626, 1627 [4th Dept 2018] [brackets omitted], lv denied 32 NY3d 1174 [2019], quoting People v Brown, 21 NY3d 739, 751 [2013]; accord People v Malloy, 33 NY3d 1078, 1080 [2019]). Here, however, the People's theory of the case, which the jury ultimately believed, was that defendant had already formed the specific intent to kill the victim when he procured the revolver (see People v Boyd, 192 AD3d 1659, 1661 [4th Dept 2021]; People v Michel, 144 AD3d 948, 949 [2d Dept 2016], lv denied 28 NY3d 1148 [2017]; People v Crosby, 265 AD2d 858, 858 [4th Dept 1999], lv denied 94 NY2d 821 [1999]; compare People v Malloy, 33 NY3d at 1080). Accordingly, the sentences on counts 1 and 3 must also be run concurrently. These modifications result in an aggregate prison sentence of 30 years to life.[FN6]
Garry, P.J., Clark, Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the judgment is modified, on the 
law, by directing that defendant's sentences for murder in the second degree and two counts of criminal possession of a weapon in the second degree under counts 1, 2 and 3 of the indictment shall all run concurrently with one another; matter remitted to the County Court of Greene County for entry of an amended uniform sentence and commitment form; and, as so modified, affirmed.
Footnotes

Footnote 1: These weapon possession charges were originally enumerated in different counts of the indictment, but became counts 2 and 4 upon dismissal of the conspiracy charge.
Footnote 2: Although defendant's appellate brief includes a generalized statement that "no reasonable factfinder could find every element of the [weapon possession] offenses proved beyond a reasonable doubt," he makes no specific argument in this regard. Nevertheless, after reviewing the trial evidence, we conclude that the People proved the weapon possession charges beyond a reasonable doubt and the verdict on those counts is not against the weight of the evidence (see Penal Law §§ 265.02 [1]; 265.03 [1] [b]; [3]).

Footnote 3: Defendant later moved into Knox's residence and was living there at the time of the February 6, 2018 search. As such, County Court found that defendant had standing to challenge the search (see generally People v Ortiz, 83 NY2d 840, 842 [1994]).

Footnote 4: After issuance of the February 2, 2018 warrants, law enforcement submitted an "Affidavit in Support of Amended Application for a Search Warrant," dated February 6, 2018, which sought to amend the warrants on the ground that the original application had unintentionally omitted a request to search for and seize "any and all weapons" and "other items which may be indicative of a homicide." This resulted in the issuance of an amended search warrant, dated February 6, 2018, authorizing a search of the residence at 124 Tool House Road for such additional evidence. However, the return from the February 6, 2018 search establishes that police were acting pursuant to the February 2, 2018 warrants on that date, which were still in effect at that time (see CPL 690.30 [1]). Thus, the February 2, 2018 warrants are the ones relevant to defendant's argument.

Footnote 5: Although County Court did not use this phrasing, its explanation as to why it was precluding admission of this video engaged in this balancing.

Footnote 6: Running the sentences on counts 2 and 3 concurrently to one another does not impact the overall prison term insofar as the sentence on count 2 was already run concurrently to the sentence on count 1 and, thus, merged into that sentence (see Penal Law § 70.30 [1] [a]). Nor will the overall period of postrelease supervision be impacted, as defendant is subject to lifetime supervision on his conviction under count 1 even if he is paroled (see Penal Law § 70.40 [1] [b]). Although defendant's challenge to the sentences on counts 2 and 3 is, therefore, academic, we cannot allow an illegal sentence to stand and, therefore, modify the judgment accordingly (see CPL 470.15; 470.20; People v Carter, 96 AD3d 1520, 1522 [4th Dept 2012]).