[828 NE2d 74, 795 NYS2d 158]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD AIKEN, Appellant.

Argued February 9, 2005; decided March 31, 2005

## POINTS OF COUNSEL

*Center for Appellate Litigation,* New York City (*Jody Ratner* and *Robert S. Dean* of counsel), for appellant. The court erroneously instructed the jury that appellant had a duty to retreat if the jury found, in accordance with appellant's testimony, that, at the time of the incident, he was (1) inside his dwelling, or (2) in the threshold of his dwelling. (*Cupp v Naughten,* 414 US 141; *People v Hernandez,* 98 NY2d 175; *People v Tomlins,* 213 NY 240; *People v Padgett,* 60 NY2d 142; *People v Mezon,* 80 NY2d 155; *Berman v H.J. Enters.,* 13 AD2d 199; *Payton v New York,* 445 US 573; *People v Reynoso,* 2 NY3d 820; *United States v Santana,* 427 US 38; *People v White,* 127 Misc 2d 219.)

*Robert T. Johnson, District Attorney,* Bronx (*Andrew N. Sacher, Joseph N. Ferdenzi* and *Nancy Killian* of counsel), for respondent. Defendant was not entitled to an instruction that he had no duty to retreat even assuming arguendo that he was standing in the threshold of his doorway when he fatally struck the victim, and alternatively, any error in the court's charge to the jury regarding self-defense was harmless in light of the overwhelming evidence that there was no justification for defendant's attack on the victim. (*People v Sullivan,* 7 NY 396; *People v Tomlins,* 213 NY 240; *People v Kennedy,* 159 NY 346; *People v Constantino,* 153 NY 24; *People v Seit,* 86 NY2d 92; *People v Crimmins,* 36 NY2d 230; *People v Berk,* 88 NY2d 257; *People v Hernandez,* 98 NY2d 175; *People v Padgett,* 60 NY2d 142; *People v Butts,* 72 NY2d 746.)

### OPINION OF THE COURT

Chief Judge KAYE.

Before defensively using deadly physical force against another, does a defendant standing in the doorway between his apartment and the common hall of a multi-unit building have a duty under Penal Law § 35.15 to retreat into his home when he can safely do so? We answer that question in the affirmative.

### Facts

Defendant and the victim were next-door neighbors in the same apartment building in the Bronx for nearly 40 years, virtually their entire lives. Their families were close until 1994 or

1995, when a dispute—with ultimately tragic consequences— arose over cable and telephone wiring. The victim and his family believed that defendant was siphoning off their services, even after the service providers found that the suspicion was without basis. In 1997, following a heated verbal exchange, the victim stabbed defendant in the back, hospitalizing him for two days. Although the families remained next-door neighbors, separated only by a common wall, from 1997 to 1999 the victim repeatedly threatened to shoot, stab or otherwise injure defendant. He made these threats to defendant's face, to his father and to neighbors—at one point even brandishing a boxcutter.

On December 21, 1999, defendant and the victim argued through the shared bedroom wall between their apartments. Using a metal pipe, defendant knocked an indentation into his side of the wall. The victim then left his apartment to go downstairs and open the building's front door for the police, who responded to the 911 call his mother had made about defendant. Defendant, inside his apartment, walked to his front door several times, opening it and looking into the public hall until he saw the victim there with a friend.

Still holding the metal pipe he had earlier used to hit the wall, defendant (while remaining in his doorway) then engaged in an angry argument with the victim.[1] According to defendant's trial testimony, he continued standing in the doorway, never going into the hall, when the victim reached into his pocket, came up to defendant's face "nose to nose," and said "he was going to kill" him. Believing he was about to be stabbed again, defendant struck the victim on his head with the metal pipe, killing him.

As defendant requested, the trial court instructed the jury as to the Penal Law § 35.15 defense of justification, including that "a person may nevertheless not use defensive deadly physical force if he knows he can with complete safety to himself avoid such use of deadly physical force by retreating." Immediately after this instruction, defendant asked the court to "charge the jury that if a defendant is in his home and close proximity of a threshold of his home there is no duty to retreat." The trial court denied the request, ruling "[defendant] said he was at the doorway and I don't consider that being inside his home . . . ." The jury acquitted defendant of murder but convicted him of

---

1. In reviewing defendant's appeal, we consider the evidence in the light most favorable to defendant (*see People v Padgett*, 60 NY2d 142, 144 [1983]).

manslaughter in the first degree, and he was sentenced to a determinate term of 16 years. The Appellate Division affirmed, as do we.

### The Duty to Retreat

Historically, English common law justified deadly force only in circumstances where one was executing the law—effecting a legal arrest or preventing violent felonies (*see* Perkins, *Self-Defense Re-Examined*, 1 UCLA L Rev 133 [1954]). When deadly force was reasonably used in self-defense it only excused—but did not justify—the homicide (*see* Wharton, Homicide, ch IX, § III, at 211 [1855]). The difference was more than theoretical, as the excused killer was subject to property forfeiture and, at times, even a penal sentence (*see* Dressler, Understanding Criminal Law § 17.01, at 205 [3d ed]). However, with the enactment of 24 Henry 8 chapter 5 (1532), the justification defense was enlarged to include deadly force reasonably used in self-defense. This broader reading of the justified use of deadly force was further refined by cases involving attacks in the dwelling of the defender. Such a defender—even if the original aggressor—did not have a duty to retreat when inside the home, or "Castell" (Lambard, Eirenarcha or of the Office of the Justices of Peace, at 250 [1599]).

Our contemporary castle doctrine grew out of a turbulent era when retreat from one's home necessarily entailed increased peril and strife (*see* Thompson, *Homicide in Self-Defence*, 14 Am L Rev 545, 548, 554 [1880]). The rationale that evolved—now widely accepted—is that one should not be driven from the inviolate place of refuge that is the home. "It is not now, and never has been the law that a man assailed in his own dwelling, is bound to retreat. If assailed there, he may stand his ground, and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home" (*see People v Tomlins*, 213 NY 240, 243 [1914, Cardozo, J.]).

The home exception to the duty to retreat reflects two interrelated concepts—defense of one's home, and defense of one's person and family. "[T]he house has a peculiar immunity [in] that it is sacred for the protection of [a person's] family," and "[m]andating a duty to retreat for defense of dwelling claims will force people to leave their homes by the back door while their family members are exposed to danger and their houses are burgled" (*State v Carothers*, 594 NW2d 897, 900, 901 [Minn 1999] [internal quotation marks and citations omitted]). Yet

somewhat at odds with this privileged status accorded the home is the state's general interest in protecting life. "The duty to retreat reflects the idea that a killing is justified only as a last resort, an act impermissible as long as other reasonable avenues are open" (*People v Jones*, 3 NY3d 491, 494 [2004]). Indeed, requiring a defender to retreat before using deadly force may in fact be the "more civilized view" (2 LaFave, Substantive Criminal Law § 10.4 [f], at 155 [2d ed]). Inevitably, then, a balance must be struck between protecting life by requiring retreat and protecting the sanctity of the home by not requiring retreat.

Prior to 1940, New York's decisional law tended toward protection of life by imposing a generalized duty to retreat in the face of deadly force (*People v Tomlins*, 213 NY 240 [1914]; *People v Kennedy*, 159 NY 346, 349 [1899]; *People v Constantino*, 153 NY 24 [1897]). However, in *People v Ligouri* (284 NY 309, 317 [1940]), this Court departed from what had been the traditional retreat rule and held that a defendant faced with felonious attack on a public street was justified "in standing his ground and, if necessary, destroying the person making the felonious attack." The Legislature responded in its 1965 revision of the Penal Law (*see* L 1965, ch 1030; *see also* Denzer and McQuillan, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 35.15, at 64 [1967 ed]). Codifying what had been the common law of the state prior to *Ligouri*, Penal Law § 35.15 (2) (a) for the first time statutorily limited the use of lethal defensive force to circumstances when the defender "knows that he can avoid the necessity of using such force with complete safety . . . by retreating" (Penal Law § 35.15 [2] [a]). The Legislature also incorporated the castle doctrine—balancing the competing interests of protecting the home and protecting life—directing that the duty to retreat does not apply when the defender "is in his dwelling and was not the initial aggressor" (Penal Law § 35.15 [2] [a] [i]).[2]

Thus, our current statutory recognition of the castle doctrine in Penal Law § 35.15 reaffirmed New York's traditional self-defense principles (*see People v Hernandez*, 98 NY2d 175, 182 [2002]). If the attack occurs in the dwelling, a defender need not retreat but may use reasonable force to repel it.

---

2. Reflecting the principle that the home is a unique place in which one may use force to prevent the commission of a crime, the Penal Law also authorizes a person to use deadly physical force to protect the dwelling from a burglary (*see* Penal Law § 35.20 [3]).

## Application to This Case

Defendant argues that the trial court erred in refusing to instruct the jury that he had no duty to retreat because a reasonable view of the evidence supported an inference either that he was inside his apartment when confronted by the victim or that he was in the doorway between his apartment and the common hall.

Initially, we recognize that the evidence supported defendant's request for a justification charge. Only recently, in *People v Jones*, we held that the defendant "never claimed, and there is no reason to believe, that he was fearful of being killed or harmed by the actions of the deceased" (3 NY3d at 497). Here, by contrast, defendant presented evidence of his prior history with the victim, the victim's threats and violent conduct, as well as defendant's subjective belief that the victim was about to stab him again. While he was thus entitled to the justification charge, he was not entitled to a jury instruction that he had no duty to retreat.[3]

Under no reasonable view of the evidence was defendant actually inside his apartment when confronted by the victim. Both in his trial testimony and in his pretrial statement to the police, defendant repeatedly stated that he was in the doorway, not inside the apartment, when the victim confronted him. Further, the victim collapsed and died in the hallway, with no part of his body inside defendant's apartment. Consequently, defendant was not entitled to a jury instruction that he had no duty to retreat on the theory that he was inside his apartment.

Nor did defendant's claim that he was standing in the doorway, or threshold, of his apartment entitle him to that instruction.

---

3.   Having concluded that the trial court correctly charged justification, we have no occasion to address the Appellate Division's alternative holding that "if there were any error in the refusal to give the requested charge, such error would have been harmless in view of the overwhelming evidence that defendant unjustifiably attacked the victim outside of defendant's apartment, which evidence leaves no significant probability, or even a reasonable possibility, that the verdict would have been different had the requested charge been given" (6 AD3d 236, 237 [2004]; *compare People v Jones*, 3 NY3d at 497 [because the proof at trial did not support defendant's requested justification charge, the court's refusal to instruct that defendant had no duty to retreat was harmless], *with People v McManus*, 67 NY2d 541, 549 [1986] ["if any reasonable view of the evidence would permit the fact finder to decide that the conduct of the accused was justified, an instruction on the defense should be given . . . (R)efusal to charge that the People must disprove the alleged justification is reversible error"]).

Defendant argues that the doorway between the apartment and the shared hall was part of his dwelling—his private sanctuary. As we recognized in *People v Hernandez* (98 NY2d 175, 183 [2002]), whether a particular area is part of a dwelling under Penal Law § 35.15 "depends on the extent to which defendant . . . exercises exclusive possession and control over the area in question."[4]

Here, defendant was in an area that functioned as a portal between an interior world and a public one. It was the region where a stranger, seeking access to the interior, could ask for entry. The actual physical space of the doorway straddled both the private apartment and the public hall. A nonresident could stand there and knock, ring a bell or turn the door's handle. The resident had exclusive control and possession only over that part of the apartment, the private property, from which nonresidents could ordinarily be excluded. The doorway did not function as the asylum of the home—it was instead a hybrid private-public space in which a person did not have the same reasonable expectation of seclusion and refuge from the outside world (*see also People v Reynoso*, 2 NY3d 820 [2004] [defendant in doorway, as opposed to inside apartment, may be arrested without a warrant]).

Indeed, the Penal Law and its common-law history reflect the concept behind the castle doctrine that inside one's home a person is in a unique haven from the outside world. While a person is not bound to abandon one's home, requiring a person standing in the doorway to step inside the apartment to avoid a violent encounter is not the equivalent of mandating retreat from one's home. Here, defendant need only have closed the door, or pulled up the drawbridge, to be secure in his castle.

---

4. Depending on the facts, the castle doctrine has been applied to areas immediately surrounding the home, such as a porch or yard (*see* Dressler, Understanding Criminal Law § 18.02 [C] [3], at 228 [3d ed]; *see also State v Blue*, 356 NC 79, 89, 565 SE2d 133, 139-140 [2002] [a porch may be part of the dwelling for self-defense purposes because "the occupants of a home may engage in many of the same activities on the porch that they enjoy in the more protected areas . . . such as eating, reading, sleeping, entertaining, and relaxing"]; *Doswell v State*, 34 Ala App 546, 42 So 2d 480 [1949] [defendant in garden—which was part of the house's curtilage—was entitled to jury instruction that he had no duty to retreat]).

As we also noted in *Hernandez* (98 NY2d 175 [2002]), different provisions govern what constitutes a dwelling for purposes of justification in defensive use of physical force in a burglary under Penal Law § 35.20.

Accordingly, the order of the Appellate Division should be affirmed.

Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur.

Order affirmed.