■ The People of the State of New York, Respondent, v Aladdin Sanchez, Also Known as "Shags," Appellant. [50 NYS3d 83]—

Appeal by the defendant from a judgment of the County Court, Dutchess County (Forman, J.), rendered August 5, 2014, convicting him of manslaughter in the first degree, assault in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is modified, on the law, by vacating the convictions of manslaughter in the first degree, assault in the first degree, and assault in the second degree, and the sentences imposed thereon, and dismissing the count in the indictment charging murder in the second degree, without prejudice to the People to re-present any appropriate charges to another grand jury (*see People v Beslanovics*, 57 NY2d 726 [1982]); as so modified, the judgment is affirmed, and a new trial is ordered on the counts of the indictment charging the defendant with assault in the first degree and assault in the second degree.

The defendant was convicted of manslaughter in the first degree for the June 15, 2013, shooting death of Ines Amigon. He was also convicted of assault in the first degree and assault

in the second degree for the shootings of Rolando Baldemar and Sandy Vivaldo, respectively, as well as criminal possession of a weapon in the second degree.

Viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383 [2004]). Upon reviewing the record here, we are satisfied that the verdict was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

The County Court properly denied the defendant's request to charge manslaughter in the second degree as a lesser-included offense of murder in the second degree since, viewing the evidence in the light most favorable to the defendant, there was no reasonable view of the evidence that would support a finding that the defendant acted recklessly (*see People v Dickerson*, 67 AD3d 700 [2009]).

The defendant's contention that the County Court's charge on accomplice corroboration was improper is without merit (*see People v Arena*, 69 AD3d 867 [2010]).

However, we agree with the defendant's contention that the County Court should have submitted a justification defense charge to the jury with respect to the crimes of manslaughter in the first degree, assault in the first degree, and assault in the second degree.

"[A] charge on justification is warranted whenever there is evidence to support it" (*People v McManus*, 67 NY2d 541, 549 [1986]). Indeed, "if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified" (*People v Padgett*, 60 NY2d 142, 145 [1983]), "the trial court should instruct the jury as to the defense and must when so requested" (*id.* at 144-145). In determining whether a justification charge is warranted, a court must view the record in the light most favorable to the defendant (*see People v Petty*, 7 NY3d 277, 284 [2006]; *People v Singh*, 139 AD3d 761, 762 [2016]). Contrary to the conclusion reached by our dissenting colleague and the County Court, we find that there was a reasonable view of the evidence to support the defendant's request for a justification charge pursuant to Penal Law § 35.15 (2) (b).

In February of 2014, prior to trial, codefendant Armando Martinez-Mendoza, also known as "Balu," who fired the shots that killed Amigon and wounded the other victims, pleaded guilty to murder in the second degree and two counts of assault in the first degree, and waived his right to appeal. He signed an agreement requiring him to testify against the defendant at the defendant's trial. The agreement provided that he must testify truthfully.

When viewed in the light most favorable to the defendant, the testimony presented at trial reveals the following. On March 31, 2013, the defendant was at a bar in Newburgh, along with Martinez-Mendoza, when they became involved in a fight with others in the bar. The defendant was stabbed in the abdomen. The defendant was then airlifted to Westchester Medical Center, where he was hospitalized for approximately 10 days. It was the defendant's understanding that the "word on the street" after that attack upon him was that the attackers never "finished the job."

Approximately six weeks later, on the evening of June 15, 2013, the defendant, together with a group of companions comprising two men and two women, went to the El Molino restaurant and bar in Poughkeepsie. At trial, the defendant testified that while at El Molino, he went to the bathroom, where he saw an individual called Casper snorting cocaine. Another person, Melvin Hernandez, was also there. When Casper asked the defendant if he wanted to buy drugs, the defendant declined. Casper and Melvin Hernandez started to question the defendant about tattoos on the defendant's arm. Without warning, Casper punched the defendant in the face, and he fell to the ground. A third person, Roman Berra, then entered the bathroom, and the three men started kicking the defendant while commenting on his tattoos, calling him "pussy" and "mother fucker," and saying "East Side" repeatedly. The defendant was afraid that he would be stabbed again and thought that his stomach wound from the prior attack had been opened. The defendant testified that the bar "bouncer," Jermaine Knox, who was also in the bathroom, did nothing to stop the attack, merely blocked the door, and "just stood there." Knox testified that when he went to the bathroom, he saw the altercation between the defendant and his attackers. The defendant claimed that Casper and his companions left the bathroom laughing, and told the defendant that they would kill him if he ever came back.

According to the defendant, after he was assaulted, he spoke to his male companions, Jonathan Ramirez and Martinez-

Mendoza, who was drunk. The defendant had a purple eye and had a sharp pain in the location of his prior stab wound. When one of his female companions asked him if he was okay, the defendant answered that he had to leave because he was getting dizzy. All of them then decided to leave El Molino, and the defendant told one of his female companions to go open the car because he wanted to leave "real quick" so that he could get medical attention. As they were leaving El Molino, Martinez-Mendoza asked the defendant who had attacked him, and the defendant pointed to Casper. The defendant testified that he and his companions "just wanted to get out of there," and they left on their own. The defendant testified that many people who were in the bar, approximately 10 to 15 of them, followed them outside while threatening them. They told the defendant and his friends not to come back and also threatened to kill the defendant, Ramirez, and Martinez-Mendoza. Outside El Molino, the defendant saw the people who had attacked him earlier in the bathroom, together with 10 to 15 other people. The defendant claimed that they seemed to be "bragging" about what they had done to him. According to Martinez-Mendoza, someone in the crowd said "you're gonna pay for it" in Spanish. Knox testified that Casper may have continued to be aggressive toward the defendant and his companions after the defendant's group exited the club. The defendant, along with his two female companions, then started walking toward the car while Ramirez and Martinez-Mendoza stayed behind, trying to keep the people outside the bar away from them. The people were calling the defendant "pussy" and kept repeating "East Side, East Side." They were also making threats. Martinez-Mendoza told the defendant to go to the car to get a gun from Ramirez's backpack, because there was going to be trouble. Indeed, the defendant's female companions, Tania Raya and Milagros Huerta, each testified that while leaving the club, they were both fearful of being injured. On his way to the car, the defendant turned around and saw Ramirez break a beer bottle in an attempt to keep some people away. The defendant quickly walked to the car, where he grabbed the gun from the backpack in the car. He intended for Martinez-Mendoza to use it to scare the people away, and did not believe Martinez-Mendoza would fire the gun. The defendant believed he could not leave without his friends. The defendant testified that the men outside the bar were making threats and that if he did not have "a weapon they would probably hurt us." He thought that his life and the lives of his friends were in danger. Although there was also a knife in the backpack, he did not take it because he did not think that it would be sufficient to

keep the people away. When the defendant returned with the gun to his friends, he observed one of the men who had attacked him in the bathroom reaching into the waist of his pants to obtain what the defendant believed to be a weapon, something he described as being shiny. Amigon, the victim, said something to Casper and grabbed Ramirez's arm, at which time Martinez-Mendoza grabbed the gun from the defendant's hand. Martinez-Mendoza shot in Casper's direction, but Amigon was in front of Casper, in the line of fire, and was shot.

Testifying on behalf of the People as required by his plea agreement, Martinez-Mendoza maintained that when they were outside El Molino, the defendant handed him the gun and then pointed out the man who had hurt him. He testified that he fired the gun because he was angry about "what they did" to the defendant and because he was drunk, but admitted, on direct examination, that at the time of his arrest, he told the investigating police officers that he shot the victim and the others because he felt threatened and was afraid. At trial, he testified that what he told the police had been a lie. Martinez-Mendoza also testified that at the time of his arrest, he had told the police that there was a crowd of people coming after them out of the bar, as many as 20; at trial, he testified that this also was a lie. On cross-examination, Martinez-Mendoza testified that when he spoke to his mother from the police department following his arrest, he told her the same story about the threatening crowd that he told the police. Upon cross-examination, he testified that he lied over and over again to the police about the night of the shooting, but contended that he was being truthful at trial. Martinez-Mendoza did, however, admit during cross-examination that the reason he had the gun and was aiming it at the people outside of El Molino was to protect his friends and to keep the people away from them, that he was fearful for the safety of himself and his friends while they were leaving the club, and that he wanted to protect them.

At the outset, we note that whether the defendant intended for Martinez-Mendoza to use the gun he provided or knew that he would use the gun does not preclude a defense of justification (*see People v Magliato*, 68 NY2d 24, 28-29 [1986]; *People v Giamanco*, 188 AD2d 547, 547 [1992]).

Our dissenting colleague's conclusion that there was no reasonable view of the evidence that would have permitted the jury to find that the defendant acted with justification seems to diminish the import of the well-settled principle that, in determining whether the evidence warrants a justification

charge, the court must assess the record in the light most favorable to the defendant (*see People v Petty*, 7 NY3d at 284; *People v Magliato*, 68 NY2d at 29; *People v McManus*, 67 NY2d at 549; *People v Padgett*, 60 NY2d at 144; *People v Watts*, 57 NY2d 299, 301 [1982]; *People v Irving*, 130 AD3d 844, 845 [2015]). We agree that here, some evidence contradicted the defendant's testimony. However, the record also included evidence, including testimony from Martinez-Mendoza, that, when viewed in the light most favorable to the defendant and drawing all reasonable permissible inferences in his favor, indicated the propriety of charging the justification defense requested by the defendant. Indeed, a justification defense was found to be appropriate in cases where part of a defendant's testimony was inconsistent with a justification defense (*see People v Padgett*, 60 NY2d at 144-145), where a defendant's testimony was in conflict with that of other witnesses (*see People v Huntley*, 87 AD2d 488 [1982], *affd* 59 NY2d 868 [1983]; *People v Locicero*, 87 AD3d 1163, 1164 [2011]), and even where there was "strong" evidence to negate a defendant's testimony relating to justification (*People v Curry*, 85 AD3d 1209, 1212 [2011]).

Furthermore, we disagree with the conclusion drawn by our dissenting colleague that the defendant could not have reasonably believed that there was no ability to safely retreat, as demonstrated by the fact that the defendant, along with his female companions, were able to get to the car without incident a few minutes earlier. The use of lethal defensive force is limited to circumstances when the defender cannot "with complete personal safety, to oneself and others," "avoid the necessity of so doing by retreating" (Penal Law § 35.15 [2] [a]; *see People v Aiken*, 4 NY3d 324 [2005]). However, the duty to retreat does not arise until the defendant forms a reasonable belief that another person "is using or about to use deadly physical force" (Penal Law § 35.15 [2] [a]). More specifically, the other person's deadly force must be actually occurring or imminent before the duty to retreat arises (*see Matter of Y.K.*, 87 NY2d 430, 434 [1996]). Here, the evidence, when viewed in the light most favorable to the defendant and drawing all reasonable inferences in his favor, might lead a jury to decide that it was not until the point in time that the defendant returned to his companions with the gun that the threat of deadly physical force was imminent. Thus, the justification defense remained available to this defendant, even though it may have been more prudent for his own safety for him to leave the area of El Molino when he first went to the car to retrieve the gun (*see People v Magliato*, 68 NY2d at 30; *People v McManus*, 67 NY2d at 549).

Because there was a reasonable view of the evidence to support a justification charge, the charge should have been given (*see People v Petty*, 7 NY3d at 284; *People v McManus*, 67 NY2d at 549; *People v Fermin*, 36 AD3d 934, 935 [2007]). Further, the error was not harmless since it cannot be said that there was no significant probability that the verdict would have been different if the charge had been given (*see People v Irving*, 130 AD3d at 845).

Here, the evidence shows that the defendant, indicted on charges of murder in the second degree and assault in the first degree on an acting-in-concert theory, was entitled to assert a justification defense notwithstanding that his codefendant who shot the victims pleaded guilty to those offenses. The right to present a defense is "a fundamental element of due process of law" (*Washington v Texas*, 388 US 14, 19 [1967]), and one of the "minimum essentials of a fair trial" (*Chambers v Mississippi*, 410 US 284, 294 [1973]). As an initial matter, to find that Martinez-Mendoza's plea of guilty precludes the defendant from establishing his entitlement to a justification charge, regardless of whether an examination of the record as a whole would support such a charge, would impermissibly infringe upon the defendant's right to due process. Second, under the evidence viewed in the light most favorable to the defendant, there is a reasonable view of the evidence that, notwithstanding the plea of guilty, Martinez-Mendoza's use of deadly and ordinary physical force was justified to protect himself and his friends. In this case, we find it would not be unreasonable for the jury to reject Martinez-Mendoza's trial testimony as unworthy of belief, as the jury was aware that testifying against the defendant was a condition of Martinez-Mendoza's plea agreement. Viewing the record as a whole, upon such a determination, it also would not be unreasonable for the jury to conclude that Martinez-Mendoza fired the gun because he was faced with a threatening crowd and feared that deadly physical force was going to be used against himself and his friends. Since the defendant was charged with the shared intent of Martinez-Mendoza, he too was entitled to the defense of justification (*see People v Fermin*, 36 AD3d at 934; *People v Gant*, 282 AD2d 298, 299-300 [2001]).

We note, however, that the failure to instruct the jury on the justification defense does not affect the conviction of criminal possession of a weapon (*see People v Pons*, 68 NY2d 264 [1986]; *People v Tasheem*, 298 AD2d 411, 412 [2002]).

Accordingly, we modify the judgment by vacating the convictions of manslaughter in the first degree, assault in the first

degree, and assault in the second degree, and the sentences imposed thereon, and by dismissing the count in the indictment charging murder in the second degree. As the defendant was convicted of manslaughter in the first degree, charged as a lesser-included offense of murder in the second degree, we dismiss the count of the indictment charging murder in the second degree with leave to the People to re-present any appropriate charges to another grand jury (*see People v Gonzalez*, 61 NY2d 633 [1983]; *People v Beslanovics*, 57 NY2d 726 [1982]; *People v Andujar*, 105 AD3d 756 [2013]; *People v Kim*, 83 AD3d 866 [2011]; *People v Lauderdale*, 295 AD2d 539 [2002]).

In light of our determination, we need not reach the defendant's remaining contentions. Leventhal, J.P., Cohen and Duffy, JJ., concur.

LaSalle, J., concurs in part and dissents in part, and votes to affirm the judgment, with the following memorandum: I agree with my colleagues in the majority that the evidence was legally sufficient to prove the defendant's guilt of the charges of manslaughter in the first degree, assault in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree. I also agree with my colleagues in the majority that the County Court properly denied the defendant's request to charge manslaughter in the second degree as a lesser-included offense of murder in the second degree. However, I respectfully dissent, and vote to affirm the judgment, because I conclude that the court properly denied the defendant's request for a justification charge. In my opinion, viewing the evidence in the light most favorable to the defendant, there was no reasonable view of the evidence which would have permitted the jury to find that the defendant's conduct was justified. Accordingly, I vote to affirm the judgment of conviction.

I. The People's Case

In the evening of June 15, 2013, the defendant and four of his friends went to El Molino, a restaurant and bar in Poughkeepsie. The four friends were the codefendant Armando Martinez-Mendoza, Jonathon Ramirez, Milagros Huerta, and Tania Raya. Raya drove all of them in her car, and the men brought two backpacks with them.

While the defendant and his friends were in the bar, Jermaine Knox, who was working security, went into the bathroom and saw the defendant in an altercation with an individual called Casper. Upon exiting the bathroom, the defendant, who appeared to be upset and in pain, spoke to Martinez-Mendoza and Ramirez, both of whom appeared angry.

When the defendant and his friends were leaving El Molino, another bouncer heard Martinez-Mendoza say "Fuck El Molino" and "we're going to get you all." Raya heard the defendant say to either Martinez-Mendoza or Ramirez, "I'll show you who it is." The defendant told Raya to go open the car, and Huerta went with her. Raya, Huerta, the bouncer, and Roman Berra, the owner of El Molino, all testified that while the defendant and his friends were exiting the bar, no one was threatening them.

While outside El Molino, Ramirez was observed waving a beer bottle at individuals. Meanwhile, Raya, Huerta, and the defendant arrived at the car. The defendant opened the back door, reached into the back seat for something, and then returned to the front of El Molino where Martinez-Mendoza and Ramirez had remained. There were approximately five or six other individuals outside. Huerta overheard Martinez-Mendoza and Ramirez ask the defendant "who did it." The defendant then whispered something in Martinez-Mendoza's ear and handed him a gun. Martinez-Mendoza began to fire the gun in the direction of the people who had gathered outside, and struck an individual who then ran inside the bar. Martinez-Mendoza then went inside the bar and continued firing the gun, striking two more individuals.

Raya drove her vehicle to the front of El Molino, and the defendant, Martinez-Mendoza, and Ramirez got inside. She testified that she did not hear anyone making threats while she was driving to the front of El Molino. Shortly after leaving El Molino, Raya's vehicle was pulled over by a police officer. The police officer observed a silver-colored handgun between the center console and the front passenger seat, and also observed one of the backpacks, which contained a kitchen knife.

Martinez-Mendoza, who signed an agreement requiring him to testify truthfully at the defendant's trial, was called as a People's witness. He testified that while at the bar, he went into the bathroom to find the defendant getting up from the floor with a swollen face. Martinez-Mendoza later learned that the defendant had been in a dispute with someone over the price of drugs. Martinez-Mendoza was angry and asked the defendant who had hit him. As they returned to the bar, the defendant told Martinez-Mendoza that he would show him who had attacked him. The two of them, together with Ramirez, Raya, and Huerta, then proceeded to leave, and as they were leaving, Ramirez told the defendant to go get the gun. The defendant had previously bought the gun, but Martinez-Mendoza denied that the defendant ever gave it to him before the shoot-

ing. No one was yelling at or threatening them, throwing things at them, or rushing toward them as they were leaving.

Martinez-Mendoza testified that he started yelling and screaming to get people to come outside. When four or five people came outside, he asked them who hit the defendant, because he wanted to "go after the guy." At the time, Ramirez was waving a broken beer bottle. The defendant came and stood behind him, handed him a gun, and then pointed to a man and said "that's him." Martinez-Mendoza testified that before the defendant handed him the gun, no one was threatening them or trying to come after them. Martinez-Mendoza fired in the direction the defendant had indicated, and hit a man who was not armed and was standing approximately four or five feet away from him. He then walked toward the bar and continued shooting, hitting two other people. Martinez-Mendoza testified that he fired the gun because he was drunk and angry that the defendant had been assaulted. When they got in the car, he gave the gun to the defendant. Shortly after that, the police pulled them over. Martinez-Mendoza admitted that he initially lied to police when he said that he shot the victims because he felt threatened and afraid.

## II. The Defendant's Case

The defendant testified that on March 31, 2013, less than three months prior to the incident that occurred at El Molino, he was the victim of a stabbing that occurred outside a club in Newburgh. As a result of that stabbing, the defendant purchased a gun from a man in Newburgh. Although the defendant later gave the gun to Martinez-Mendoza, the gun was kept in the defendant's house because Martinez-Mendoza did not want his parents to find it.

On June 15, 2013, when the defendant and his friends were going to El Molino, Martinez-Mendoza and Ramirez both brought backpacks, but he did not know which backpack the gun was in. While at the bar, the defendant went into the bathroom and saw Casper snorting cocaine. Casper asked the defendant if he wanted to buy drugs, and the defendant declined. Casper then punched him in the face, and other individuals began kicking him.

After the defendant was assaulted, he spoke to Ramirez and Martinez-Mendoza, who was drunk. The defendant was in pain and wanted to leave the bar to get medical attention. The defendant asked Raya to go open the car because he wanted to leave quickly. While they were leaving the bar, Martinez-Mendoza asked the defendant who had attacked him, and the defendant pointed to Casper. The defendant testified that he

and his friends just wanted to leave, and they left on their own.

As they were leaving, approximately 15 people followed and threatened them. They told the defendant and his friends not to come back, and threatened to kill Ramirez and Martinez-Mendoza. Martinez-Mendoza told the defendant to get the gun from Ramirez's backpack. The defendant saw Ramirez break a beer bottle in what he believed was an attempt to keep people away. The defendant testified that he, Huerta, and Raya walked toward the car, and Ramirez and Martinez-Mendoza stayed behind, trying to keep the people outside the bar, who were continuing to make threats, away from them. The defendant testified that he walked quickly to the car and retrieved the gun. He believed that his life and his friends' lives were in danger. Although there was also a knife in the backpack, the defendant did not take it, because he believed it would not be sufficient to keep the people away. The defendant testified that he did not know whether the gun was loaded, and he did not believe that Martinez-Mendoza would shoot anyone; rather, he thought that he would only use the gun to scare people away.

The defendant testified that the people outside El Molino had lots of bottles and probably had knives. He further testified that he saw a "shiny thing," but was unsure whether it was a knife. He also testified that he saw a man reach for something at his waist, although he admitted that he never told anyone that before the trial. The defendant testified that he believed that if he had not retrieved the gun, he and his friends would have been shot and killed.

When the defendant returned to his friends with the gun, Martinez-Mendoza began shooting in Casper's direction, but struck another individual. Shortly thereafter, the defendant and Martinez-Mendoza ran to the car, but then Martinez-Mendoza went back and continued shooting.

III. Cross-Examination of the Defendant

On cross-examination, the defendant conceded various points. The defendant admitted that while he was in the bar, he pointed out to Martinez-Mendoza and Ramirez the individual who had assaulted him, and that he did not call the police after he was assaulted. He also admitted that when he and his friends were leaving El Molino, no one prevented them from leaving.

He conceded, upon being shown a videotape recording of the parking area outside El Molino, that when he went to the car to get the gun, and after he retrieved it, he was not running. Rather, the defendant described it as "speed walking." He also

admitted that there were no individuals blocking the way to the vehicle. Notwithstanding this, he never told Martinez-Mendoza or Ramirez to get in the car so they could leave. While at the car, he didn't call the police from his cell phone. He also did not tell the girls to call the police. He admitted that at this point he was safe and he could have left in the car.

The defendant reiterated during cross-examination that even though there was also a knife in the car, he took the gun because he did not believe the knife would be as effective at scaring the people away. However, he admitted that once he retrieved the gun, he never held the gun up or displayed it in any way, and he never yelled at the crowd to back off. Rather, he gave the gun to Martinez-Mendoza even though he knew he was drunk and angry; he also claimed, inconsistently, that Martinez-Mendoza grabbed the gun from him. He admitted that the gun would have been safer in his hands. He admitted that, even though there were other individuals standing outside threatening them, Martinez-Mendoza fired the gun in Casper's direction, and hit another individual who was standing in front of Casper. The defendant also admitted that he did not tell the police, when they pulled over Raya's car, that there was a gun in the car or that he saw an individual reach into his waistband while outside the bar.

IV. Justification

At trial, the defendant requested a justification charge. The County Court denied the defendant's request, finding that there was no reasonable view of the evidence that supported a justification defense. On appeal, the defendant argues that the court erred in denying his request for a justification charge. I disagree with my colleagues in the majority, and would hold that there was no reasonable view of the evidence which would have permitted the jury to find that the defendant's conduct was justified.

Penal Law § 35.15 provides, in pertinent part: "A person may not use deadly physical force upon another person . . . unless: (a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating" (Penal Law § 35.15 [2] [a]). A person is justified in using deadly physical force against another if he or she reasonably believes such to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of deadly physical force by such other

person (*see People v Heron*, 130 AD3d 754, 755 [2015]; *People v Ojar*, 38 AD3d 684 [2007]).

"[J]ustification is comprised of both subjective and objective elements. The subjective element is concerned with whether the defendant believed that the use of deadly force was necessary; while under the objective prong, the jury must consider whether a reasonable person in the defendant's circumstances would have believed that deadly force was required" (*People v Umali*, 10 NY3d 417, 425 [2008]). When a defense of justification is raised, "the People must demonstrate beyond a reasonable doubt that the defendant did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (*id.* at 425).

A charge on the defense of justification is required when requested if, viewing the evidence in the light most favorable to the defendant, there is a reasonable view of the evidence permitting the jury to find that the defendant's conduct was justified (*see People v Irving*, 130 AD3d 844 [2015]; *People v Heron*, 130 AD3d at 755; *People v Nunez*, 120 AD3d 714 [2014]; *People v Ramirez*, 118 AD3d 1108, 1112 [2014]; *People v Zayas*, 88 AD3d 918, 920 [2011]; *People v Fermin*, 36 AD3d 934, 935 [2007]). To be entitled to a justification charge relating to the use of deadly physical force, the record must include evidence that the defendant reasonably believed the victim was using or was about to use deadly physical force and that he or she could not safely retreat (*see People v Ramirez*, 118 AD3d at 1112; *People v Fermin*, 36 AD3d at 935).

The NY Criminal Jury Instructions provide that the determination of whether a person reasonably believes deadly physical force to be necessary to defend himself/herself or someone else from what he or she reasonably believes to be the use or imminent use of deadly physical force by another individual, requires the application of a two-part test (*see* CJI2d[NY] Penal Law § 35.15 [2]). "First, the defendant must have actually believed that [the individual] was using or was about to use deadly physical force against him/her [or someone else], and that the defendant's own use of deadly physical force was necessary to defend himself/herself [or someone else] from it; and Second, a 'reasonable person' in the defendant's position knowing what the defendant knew and being in the same circumstances, would have had those same beliefs" (*id.*).

"Thus, under our law of justification, it is not sufficient that the defendant honestly believed in his [or her] own mind that he [or she] was faced with defending himself/herself [or

someone else] against the use or imminent use of deadly physical force. An honest belief, no matter how genuine or sincere, may yet be unreasonable" (*id.*).

A "defendant would not be justified if he/she knew that he/she could with complete safety to himself/herself and others avoid the necessity of using deadly physical force by retreating" (CJI2d[NY] Penal Law § 35.15 [2]).

## V. Analysis

Notably, much of the defendant's testimony that he believed that the people outside El Molino were armed and that he feared for his and his friends' lives was contradicted by the testimony of all of the People's witnesses. Viewing the evidence in the light most favorable to the defendant, in my view, there was no reasonable view of the evidence that would have permitted the jury to find that the defendant's conduct was justified.

The defendant testified that after he was attacked, he was in pain and just wanted to leave quickly and seek medical attention. He further testified that he and his friends were able to leave the bar and go outside without incident. However, he testified that as he and his friends were leaving, approximately 15 people followed them, told the defendant and his friends not to come back, and threatened to kill Ramirez and Martinez-Mendoza. However, it is undisputed that none of these individuals stopped or interfered with the defendant or any of his friends from leaving the bar.

The defendant testified that these people had bottles with them; however, there was no evidence that they broke the bottles or were attempting to use them as weapons. Indeed, the only individual who broke a bottle in an attempt to utilize it as a weapon was the defendant's friend Ramirez. Although the defendant stated that the people "probably had knives," and that he saw a "shiny thing," he did not testify that he saw any of the individuals actually possess or display a knife or any other weapon. The testimony that he saw one of the individuals reach for something at his waist was revealed by the defendant for the first time at trial, and nonetheless was not evidence that the individual was reaching for a weapon.

The defendant conceded that none of these individuals attempted to stop him and his friends from leaving, and none of them was impeding their ability to get to the car. Indeed, Raya, Huerta, and the defendant were able, with complete safety, to get back to the car without anyone impeding or harming them in any way, and there was no evidence that Martinez-Mendoza and Ramirez were prevented from getting to the car.

Once the car was unlocked, rather than leaving or attempt-

ing to get Martinez-Mendoza and Ramirez into the car, the defendant retrieved the gun, and returned to the area where Martinez-Mendoza and Ramirez had remained, essentially leaving the safety of the vehicle and returning to the area where he believed deadly physical force was imminent.

In my view, the defendant's testimony did not establish that, at the time he retrieved the gun, the defendant reasonably believed that any of the people outside El Molino was using or about to use deadly physical force on himself or his friends, and that he and his friends could not safely retreat.

The defendant conceded that once he and his friends were outside, he never told his friends that they should leave. None of the individuals was physically blocking their path to the car. Yet, when Martinez-Mendoza told him to get the gun, he did not tell his friends that they should leave or that he wanted to leave. The defendant could not have reasonably believed that any of the individuals was about to use deadly physical force, because he did not see any of them possessing any weapons, other than bottles. However, even assuming that the defendant could have reasonably believed that the use of deadly physical force was imminent, he could not have reasonably believed that there was no ability to safely retreat. This was demonstrated by the fact that the defendant, Huerta, and Raya were indeed able to get to the car without incident, and the defendant conceded that he was safe at that point and could have left.

The defendant conceded that the individuals outside El Molino did not stop them from going to the car, and there was no testimony by the defendant that these individuals did anything to prevent Martinez-Mendoza or Ramirez from going to the car. There was no testimony that the individuals, aside from making threats, did anything to prevent the defendant or any of his friends from leaving. Viewing the evidence in the light most favorable to the defendant, there was no reason to believe that the defendant and his friends could not have retreated in complete safety. Rather than attempt to get Martinez-Mendoza or Ramirez to leave, the defendant went to the car, retrieved the gun, and walked back to the very location where he claimed he and his friend were being threatened.

I agree with the general proposition stated by the majority that where a principal is entitled to a justification charge, a codefendant charged with acting-in-concert with the principal is also entitled to a justification charge (*see People v Fermin*, 36 AD3d 933 [2007]; *People v Gant*, 282 AD2d 298 [2001]). Here, however, Martinez-Mendoza admitted at trial that he

lied initially when he told the police and his mother that he shot the gun because he felt threatened and afraid, and actually shot the victim and others because he was drunk and angry. Additionally, Martinez-Mendoza's guilt of intentional murder was established by his plea of guilty.

In my view, a reasonable person in the defendant's position, knowing what the defendant knew and in the same circumstances, would not have believed that the use of deadly physical force was imminent or that he and his friends could not have retreated with complete safety. In my view, there is no reasonable view of the evidence which would have permitted the jury to find that this conduct by the defendant was justified (*see People v Watts*, 57 NY2d 299 [1982]; *People v Heron*, 130 AD3d 754 [2015]; *People v Casseus*, 120 AD3d 828 [2014]; *People v Small*, 80 AD3d 786 [2011]; *People v Dickerson*, 67 AD3d 700 [2009]; *People v Simon*, 56 AD3d 804 [2008]; *People v Ojar*, 38 AD3d 684 [2007]; *People v Snell*, 256 AD2d 480 [1998]).

Accordingly, because I conclude that the County Court properly denied the defendant's request for a justification charge, I vote to affirm the judgment of conviction.